2003 VT 20

## State of Vermont v. Jonathan L. Sprague

[824 A.2d 539]

No. 02-028

Present: **Amestoy, C.J., Dooley, Morse,**[1] **Johnson and Skoglund, JJ.**

Opinion Filed February 21, 2003

_____
[1] Justice Morse sat for oral argument but did not participate in this decision.

*William H. Sorrell,* Attorney General, and *David Tartter,* Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Matthew F. Valerio,* Defender General, and *Victoria Cherney,* Appellate Attorney, Montpelier, for Defendant-Appellant.

¶ 1. **Skoglund, J.** The questions we address in this appeal are whether a reasonable person in defendant's position would have felt free to refuse a state trooper's request that he exit his vehicle, and whether a police officer may automatically order a driver to exit a vehicle following a routine traffic stop. We hold that the record evidence here did not support a finding that defendant voluntarily exited his vehicle. We further hold that a police officer must have a reasonable basis to believe that the officer's safety, or the safety of others, is at risk or that a crime has been committed before ordering a driver out of a stopped vehicle. Finding no basis for the exit order in the circumstances of this case involving a routine traffic stop for a speeding violation, we conclude that the trial court erred in denying defendant's motion to suppress and therefore that the judgment must be reversed.

¶ 2. The record evidence reveals the following. On October 3, 2000, at approximately 3:30 p.m, a state trooper operating a radar device on Route 91 in the Town of Rockingham clocked a vehicle traveling at a rate of

seventy-nine miles per hour. Nothing in the record suggests that the officer observed any indicia of drunk driving, or any other offense or traffic violation, other than speeding. The trooper followed the car in his cruiser, activated his blue lights, and parked behind the car after it had stopped on the paved shoulder of the highway. A police videotape of the events that followed, which was also transcribed, shows that the uniformed officer approached the driver's side of the car and asked the driver, "can I see your license and registration, please?" The driver, later identified as defendant, handed these to the officer through the car window. The officer asked defendant several additional questions concerning the reason for the stop, and defendant indicated that he was running late to pick up his son. The officer then said, "you mind having a seat in my car while I check your license, please?" Defendant, in response, exited the vehicle and started walking with the officer toward the police cruiser.

¶ 3. As they approached the cruiser, the officer asked defendant whether he had "any weapons, knives, sharp anything like that in your pocket? Would you mind showing me what you have, quick, before you get in my car?" Defendant thereupon emptied his pockets, revealing a small packet which, in response to additional questioning, he acknowledged contained marijuana. Under further questioning, defendant also acknowledged that he possessed "a pipe and bag." The officer proceeded to pat down defendant, found a prescription bottle which defendant indicated was for "panic attacks," and entered the cruiser with defendant. Once inside, the officer questioned defendant further about his marijuana use, work, and other subjects. At one point, the officer reassured defendant, "you're not going to end up in jail; you're going to drive away from here, okay?"

¶ 4. After several minutes, the officer completed writing up the ticket, returned defendant's license, and announced, "Okay, this's done and over with, Jon." The officer then indicated that he wanted to "just take a quick peek in the car," and addressed defendant as follows:

> What I'm going to do is just — from this point forward, Jon, it behooves you to be a hundred percent honest with me, okay? I'm not going to pull any fast ones with you or anything like that, I'm an up-front kind of guy. Okay?

> What I want to do is take a peek at what you have in the vehicle, okay? And I wouldn't mind going to your house and taking a peek there, okay? Because based on what we've

discovered right now, is people who smoke dope carry dope with you and they have dope at their house; okay?

Now, I can go the short route, or we can go the long route; okay. It's entirely up to you. But what I want to do is I just want to tell you everything now, okay; so you fully understand everything.

You got a little bit more dope at the house?

¶ 5. Defendant, responded, "A tiny bit, not much." The officer reassured defendant that he wasn't looking "to tear your place apart or anything like that,"and had defendant sign a consent form for the search of his vehicle and home, explaining that "[e]ssentially this is just for your protection; okay?" After a search of the car, defendant drove home followed by the officer and another trooper. A search of the home revealed several marijuana plants.

¶ 6. Defendant was charged with possession of two ounces or more of marijuana, in violation of 18 V.S.A. § 4230(a)(2). He moved to suppress the evidence, arguing that the searches of his pockets, car and home were nonconsensual. In a supplemental memorandum, he argued for suppression on the additional ground that any questioning beyond the traffic stop should have been preceded by *Miranda* warnings. Following a hearing, the court issued a written decision, denying the motion. The court ruled that defendant had validly consented to the search of his pockets, car and home, and that *Miranda* warnings were not required because defendant was never in custody during the incident.

¶ 7. The public defender later substituted for defendant's retained attorney, and filed a new motion to suppress, together with a cover letter from successor counsel. The letter stated that the new motion had been filed "to ensure that all issues have been raised and are preserved for appeal," and that the State and defendant had agreed to have the motion decided based on the record of the prior hearing, including the testimony and videotape previously admitted into evidence. In the event that the court denied the motion, the letter stated that the parties had agreed to a conditional plea, under terms previously reviewed by the court.

¶ 8. In addition to the arguments previously raised, the new motion asserted that defendant had not freely exited his vehicle, that the "request" that he exit constituted a further seizure requiring reasonable suspicion of criminal activity under Chapter I, Article 11 of the Vermont Constitution, and that all evidence subsequently seized was tainted by the initial illegality and should be suppressed. In its response, the State noted that the court had previously decided all of the issues raised with the

exception of the question whether defendant had properly exited the car, which it characterized as "the only issue now open for review by this Court." As to this issue, the State asserted that defendant had voluntarily consented to leave his vehicle, and that suppression was therefore unwarranted.

¶ 9. The court later issued a written decision, denying the new motion to suppress. The court observed that the claims relating to the propriety of defendant's exit from the vehicle had been waived by his failure to raise them in the initial suppression motion. Nevertheless, the court went on to state that it had reviewed the new claims on the merits and had concluded that the evidence and law did not support defendant's assertion that his decision to exit the vehicle was involuntary, or his argument that the officer's request to exit was improper. This appeal followed.

## I.

¶ 10. Defendant renews on appeal the claims raised below in the successive motions to suppress. The State raises a procedural bar at the threshold, however, arguing that the issues relating to defendant's exit from the vehicle were not preserved for review because defendant failed to raise them in the first suppression motion.

¶ 11. It is well settled that "absent plain error, issues neither litigated nor decided below will not be addressed for the first time on appeal." *State v. Parker*, 155 Vt. 650, 651, 583 A.2d 1275, 1276 (1990) (mem.). The record here, however, shows that the State agreed that defendant could raise the issues which it now claims are barred "to ensure that all issues have been raised and are preserved for appeal," acknowledged in its opposition to the new motion that the issues remained open to review, and addressed the legal and factual merits of the claims. The trial court, moreover, indicated that it had reviewed the arguments, and rejected them on the merits, albeit after indicating that they had been waived. Both parties have now fully briefed the issues to this Court, as well.

¶ 12. In these circumstances, we find that the basic purposes underlying the preservation rule would not be served by declining to address defendant's arguments. The parties had a full and fair opportunity to litigate the issues, the court addressed them on the merits, and the record is more than ample for purposes of affording meaningful appellate review. See *In re White*, 172 Vt. 335, 343, 779 A.2d 1264, 1270-71 (2001) ("purpose of the preservation rule is to ensure that the original forum is given an opportunity to rule on an issue prior to our review"); *State v. Wool*, 162 Vt. 342, 346, 648 A.2d 655, 658 (1994) (preservation rule facilitates development of adequate record for appeal). Coupled with the

fact that defendant's claims implicate fundamental constitutional rights, these several considerations persuade us that appellate review is necessary and proper. See *State v. Kinney*, 171 Vt. 239, 253, 762 A.2d 833, 844 (2000) (despite failure to preserve issue for appeal, we may review claim for plain error where it strikes at heart of defendant's constitutional rights).

## II.

¶ 13. Although defendant's claims are explicitly grounded in state constitutional and decisional law, any analysis must necessarily take account of the United States Supreme Court's seminal decision in *Pennsylvania v. Mimms*, 434 U.S. 106 (1977). There the high court interpreted the Fourth Amendment to hold that when an automobile is lawfully stopped for a traffic violation, a police officer may, as a matter of course, order the driver to exit the vehicle. *Id.* at 111. In so holding, the Court observed that the reasonableness of a search under the Fourth Amendment turns on a balance between the public interest and the individual's right to be free from arbitrary police interference. *Id.* at 109. On the public interest side, the Court thought it "too plain for argument" that the state's asserted justification for routine exit orders — officer safety — was "both legitimate and weighty." *Id.* at 110. As against this interest, the Court characterized the intrusion on the driver's personal liberty as "*de minimis*." *Id.* at 111. Thus, the Court ruled that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *Id.* at 111 n.6. In *Maryland v. Wilson*, 519 U.S. 408, 415 (1997), the Court — based on similar reasoning — extended the rule to approve routine exit orders to passengers.

¶ 14. Although many state courts that have addressed the issue have adopted the *Mimms* rule, others, analyzing the issue on state constitutional grounds, have explicitly rejected it. See *Commonwealth v. Gonsalves*, 711 N.E.2d 108, 110-11 (Mass. 1999); *State v. Kim*, 711 P.2d 1291, 1294 (Haw. 1985); see also *State v. Mendez*, 970 P.2d 722, 723-24 (Wash. 1999) (accepting *Mimms* rule under state constitution, but declining to extend it to passengers). While we have not explicitly addressed the issue, our decisions have similarly applied a more demanding standard than *Mimms* in the area of exit orders. In *State v. Jewett*, 148 Vt. 324, 327, 532 A.2d 958, 959 (1986), the defendant claimed that the police had violated his rights under Chapter I, Article 11 of the Vermont Constitution by ordering him out of his vehicle after an officer

stopped him for erratic driving and observed signs of intoxication. While recognizing the Fourth Amendment rule announced in *Mimms*, we held that an order to exit one's vehicle is a "further 'seizure' within the meaning of Article Eleven." *Id.* at 330, 532 A.2d at 961. We further held that such a seizure was "not, however, completely outside the realm of legitimate law enforcement conduct where the suspected criminal activity is DUI." *Id.*

¶ 15.  Although *Jewett* did not expressly hold that some justification for the "further seizure" represented by the exit order was required under Article 11, the suggestion was implicit, and was so noted by a number of courts and commentators. See, e.g., *Gonsalves*, 711 N.E.2d at 114 n.9 (citing *Jewett* as one of one several state decisions rejecting *Mimms*); A. Small, *Developments in State Constitutional Law: 1999*, 31 Rutgers L.J. 1383, 1390 n.49 (2000) (Vermont is one of three states to have rejected *Mimms*). The suggestion implicit in *Jewett* was reinforced in *State v. Caron*, 155 Vt. 492, 501, 586 A.2d 1127, 1132 (1990), where we upheld an exit order after a motor vehicle stop on the basis that the police had a reasonable suspicion the occupants had committed a crime and were armed and dangerous. "Where a police officer has made an initial stop based on a reasonable suspicion that the occupants have participated in a violent felony and there is a high likelihood that the occupants might be dangerous, we see no reason to preclude the officer from taking the protective measure of asking the occupants to step from the vehicle." *Id.*

¶ 16.  Thus, we have consistently, albeit implicitly, adhered to the rule — well after it was rejected in *Mimms* — that the test to determine whether an exit order was justified under Article 11 is whether the objective facts and circumstances would support a reasonable suspicion that the safety of the officer, or of others, was at risk or that a crime has been committed. What was implicit in *Jewett* and *Caron* we now determine to make explicit. As explained more fully below, a rule requiring a minimal level of objective justification for a police officer to order a driver from his or her vehicle strikes the proper balance, in our view, between the need to ensure the officer's safety and the constitutional imperative of requiring individualized, accountable decisionmaking for every governmental intrusion upon personal liberties.

▮ ¶ 17.  We have long held that the police may stop and temporarily detain a vehicle based on little more than a reasonable and articulable suspicion of wrongdoing. *State v. Lamb*, 168 Vt. 194, 196, 720 A.2d 1101, 1102 (1998); *State v. Ryea*, 153 Vt. 451, 454, 571 A.2d 674, 675 (1990). Implicit in this rule, however, is the corollary requirement that the police intrusion proceed no further than necessary to effectuate the purpose of the stop. *Ryea*, 153 Vt. at 455, 571 A.2d at 676. As the Supreme Judicial

Court of Massachusetts, in language strikingly applicable to the facts of this case, has explained: "Citizens do not expect that police officers handling a routine traffic violation will engage, in the absence of justification, in stalling tactics, obfuscation, strained conversation, or unjustified exit orders, to prolong the seizure in the hope that, sooner or later, the stop might yield up some evidence of an arrestable crime." *Gonsalves*, 711 N.E.2d at 112.

¶ 18. Nor is the additional intrusion occasioned by an order to leave a stopped vehicle one that we would regard as "minimal." As Justice Stevens, dissenting in *Mimms*, observed: "A woman stopped at night might fear for her own safety; a person in poor health may object to standing in the cold or rain; another who left home in haste to drive children or spouse to school or to the train may not be fully dressed; an elderly driver who presents no possible threat of violence may regard the police command as nothing more than an arrogant and unnecessary display of authority." *Mimms*, 434 U.S. at 120-21 (Stevens, J., dissenting). That a small percentage of routine traffic stops may result in the detection of more serious crime is no reason to subject the vast majority of citizens to routine orders to leave their vehicles.

¶ 19. We believe further that dispensing entirely with the requirement that an officer provide some reasoned explanation for an exit order invites arbitrary, if not discriminatory, enforcement. See *Mimms*, 434 U.S. at 122 (Stevens, J., dissenting) (under majority rule "[s]ome citizens will be subjected to this minor indignity while others — perhaps those with more expensive cars, or different bumper stickers, or different-colored skin — may escape it entirely"); *Gonsalves*, 711 N.E.2d at 116 (Ireland, J., concurring) (noting dangers stemming from "unfettered police power to order individuals out of automobiles without any justification"). It may be that most officers would exercise such unfettered authority responsibly and evenhandedly, but as Justice Kennedy, dissenting in *Wilson*, aptly observed, "[l]iberty comes not from officials by grace but from the Constitution by right." *Wilson*, 519 U.S. at 424 (Kennedy, J., dissenting).

¶ 20. Nor do we believe that such a rule will place law enforcement officers at risk. The facts sufficient to justify an exit order need be no more than an objective circumstance that would cause a reasonable officer to believe it was necessary to protect the officer's, or another's, safety or to investigate a suspected crime. While the rule may thus result in relatively few cases where a cautious officer would lack an objective, articulable basis for ordering a driver to leave a vehicle, as Justice Kennedy noted, "[i]t does no disservice to police officers . . . to insist upon [the] exercise of reasoned judgment." *Id.* at 423 (Kennedy, J., dissenting).

¶ 21. Applying this standard to the case at bar, we find the record evidence to be virtually bereft of any reasonable, objective basis for the officer's exit request, despite careful questioning of the officer on this very point. Counsel inquired whether there "was ... any safety concern relative to ordering [defendant] out of his vehicle ... ?" The officer responded, "[t]here's always a safety concern," but provided no further explanation specific to this stop. While the officer conceded that there were times when he had not asked drivers to exit their vehicles during traffic stops on Route 91, he acknowledged that there was nothing unusual about this particular stop relative to safety that impelled him to do so. He further acknowledged that there was no standard police policy for questioning drivers in his cruiser rather than their own cars, and admitted that he did it both ways. When pressed, the officer mentioned some factors that might influence his decision, such as location, time of day and traffic, but did not indicate that any of these had influenced his decision concerning defendant. The weather on that early October afternoon was clear, defendant's car was parked completely on the shoulder, and traffic was light. The officer also acknowledged that defendant did not appear to be armed or dangerous.

¶ 22. We are thus compelled to conclude that the record evidence provides no objective basis for ordering defendant to leave his vehicle. While given every opportunity, the officer did not indicate that he believed his safety, or the defendant's, was at risk from passing traffic, limited visibility, or any other hazard. There was obviously no concern to separate defendant from other passengers in the vehicle, as defendant was alone. There was no indication that defendant was engaged in any criminal offense requiring further investigation outside the vehicle, such as DUI, nor any suggestion that defendant was armed or dangerous. Therefore, we conclude that the additional seizure represented by the officer's request that defendant exit the vehicle was unsupported by the requisite showing of need, and in violation of Chapter I, Article 11 of the Vermont Constitution.

### III.

¶ 23. The State asserts, however, that any lack of justification was cured by defendant's voluntary consent to leave the vehicle. The argument requires a careful review of the facts in light of the established law governing consensual search and seizures. In this context, we have adopted the federal standard, limiting the inquiry "to whether the consent was voluntary, not whether there was a 'knowing' and 'intelligent' waiver." See *State v. Zaccaro*, 154 Vt. 83, 88, 574 A.2d 1256, 1259 (1990) (citing

*Schneckloth v. Bustamonte*, 412 U.S. 218, 241-42 (1973)). Voluntariness is a question of fact to be determined from the totality of the circumstances. *Id.* The State bears the burden, in such an inquiry, of demonstrating that the consent was freely given and not "coerced by threats or force, or granted only in submission to a claim of lawful authority." *Schneckloth*, 412 U.S. at 233; see also *State v. Sheehan*, 171 Vt. 642, 643, 768 A.2d 1275, 1277 (2000) (mem.).

¶ 24.  We have not definitively articulated the standard of review of a trial court determination that a defendant voluntarily consented to a search or seizure. While routinely observing that "[w]e review motions to suppress de novo," *State v. Chapman*, 173 Vt. 400, 402, 800 A.2d 446, 448 (2002); *State v. Pierce*, 173 Vt. 151, 152, 787 A.2d 1284, 1286 (2001); *State v. Graves*, 170 Vt. 646, 646, 757 A.2d 462, 463 (2000) (mem.), we have also on occasion appeared to apply a more deferential standard to the trial court's determination. See, e.g., *Sheehan*, 171 Vt. at 643, 768 A.2d at 1278 (trial court did not err in finding that defendant had voluntarily consented to police entry); *State v. Badger*, 141 Vt. 430, 444, 450 A.2d 336, 344 (1982) (noting that voluntariness of consent is factual question, and holding that court's findings supported its conclusion). While the federal appellate courts uniformly apply a clearly erroneous standard to the voluntary-consent issue, see *United States v. Mendenhall*, 446 U.S. 544, 557 (1980) (because trial court's finding of voluntariness was sustained by the record, "the Court of Appeals was mistaken in substituting for that finding its view of the evidence"); *United States v. Solis*, 299 F.3d 420, 436 (5th Cir. 2002) (appellate court reviews district court's finding of voluntariness for clear error); *State v. Thurman*, 846 P.2d 1256, 1265 n.8 (Utah 1993) (collecting federal cases), many state courts hold that the issue is a mixed question of law and fact requiring a two-step approach; underlying findings of "historical fact" are reviewed under the clearly erroneous standard, while the ultimate legal conclusion — or "constitutional fact" — as to whether the historical facts establish voluntariness is reviewed independently or de novo. See, e.g., *Graham v. State*, 807 A.2d 75, 88 (Md. Ct. Spec. App. 2002); *Vargas v. State*, 18 S.W.3d 247, 253 (Tex. Ct. App. 2000); *Thurman*, 846 P.2d at 1268-72; *State v. Phillips*, 577 N.W.2d 794, 798-801 (Wis. 1998).

■ ¶ 25.  We need not specifically resolve the issue here, however, as the trial court made no findings, and engaged in no reasoned analysis, other than to state the bare conclusion that the car exit was not involuntary. Hence, nothing in the court's decision is susceptible of deferential review. Under these circumstances, we are compelled to

review the court's ruling for correctness, considered in light of the record evidence as a whole.

¶ 26. The State's argument is premised principally on the fact that, as revealed in the police videotape, the officer phrased the statement that resulted in defendant's departure from the vehicle in the form of a request, "[y]ou mind having a seat in my car while I check your license, please?" The State correctly notes that mere questioning by the police does not amount to a seizure, and that no coercion is present "as long as the police do not convey a message that compliance with their request is required." *Florida v. Bostick*, 501 U.S. 429, 435 (1991). The critical inquiry is "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id.* at 436.

¶ 27. The Supreme Court has also instructed that there is no "litmus-paper test for distinguishing a consensual encounter from a seizure," *Florida v. Royer*, 460 U.S. 491, 506 (1983) (plurality opinion), and that courts must therefore carefully consider the precise factual setting and circumstances. As the high court has explained:

> The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation. Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free to "leave" will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.

*Michigan v. Chesternut*, 486 U.S. 567, 573 (1988).

¶ 28. Viewing the circumstances here in their totality, we conclude that a reasonable person in defendant's circumstances would not have felt free to refuse when the officer asked him if he would "mind having a seat in my car while I check your license." We base this conclusion on several factors. First, the setting was inherently coercive; defendant had already been seized by virtue of the initial motor vehicle detention and the officer's show of authority. See *Ferris v. State*, 735 A.2d 491, 502 (Md. 1999) (noting enhanced coercive nature of prior traffic detention in holding that defendant's subsequent submission to officer's request that he exit his vehicle was not voluntary); *People v. H.J.*, 931 P.2d 1177, 1181 (Colo. 1997) ("[I]t strains credulity to imagine that any citizen, directly on the heels of having been pulled over to the side of the road by armed and uniformed police officers in marked patrol cars, would ever feel free to leave or at liberty to ignore the police presence and go about his business.") (internal

quotations and citations omitted). While perhaps not "in custody" to the point of requiring *Miranda* warnings, see *Berkemer v. McCarty*, 468 U.S. 420, 438-40 (1984), a driver detained for a motor vehicle violation is simply not in the same position as a person who is merely approached and questioned by law enforcement officers on the street or in an airport or common carrier. Cf. *Bostick*, 501 U.S. at 436 (police questioning of bus passengers was not seizure under Fourth Amendment nor inherently coercive); *Royer*, 460 U.S. at 497 (merely approaching and questioning individual in public place does not amount to seizure under Fourth Amendment).

¶ 29. We note, as well, that the officer's "request" to exit the vehicle came almost immediately after his initial "request" to see defendant's license and registration ("can I see your license and registration, please?"). The latter request plainly communicated no more choice to defendant than the former. See 23 V.S.A. § 1601 (police officer may demand and inspect driver's license and registration). Requiring a person in defendant's position to distinguish the options legally available to him in response to the two questions (no, he may not refuse the request for license and registration but yes, he may refuse the request to exit the vehicle because it is beyond the scope of the temporary detention) asks more, in our view, than is reasonable or realistic to expect of the average citizen. Furthermore, while a suspect's knowledge of the right to refuse is not essential to a finding of consent, it is plainly a factor to be taken into account. *Schneckloth*, 412 U.S. at 249. The officer here gave no indication to defendant that he could refuse to leave his vehicle, and while the officer later claimed that he would have honored such a refusal, he also acknowledged that in his eleven years as a law enforcement officer he could recall only one person who had ever done so — a woman who did not feel comfortable entering his cruiser.

¶ 30. We thus conclude that a reasonable person in defendant's circumstances would not have felt free to refuse the officer's request. We therefore hold that defendant was illegally seized when — absent any objective danger to the officer or others, or a reasonable suspicion of wrongdoing — he was required to exit the vehicle.

IV.

¶ 31. Because the seizure effected by the officer in requiring defendant to exit the vehicle was illegal, we conclude that defendant's subsequent "consents" to the search of his person, car, and home were

tainted and ineffective.[2] See *Royer*, 460 U.S. at 507-08 (where defendant was illegally detained when he consented to search of his luggage, "the consent was tainted by the illegality and was ineffective to justify the search"). Accordingly, all of the evidence seized by the police should have been suppressed. Although, to be sure, evidence obtained by means of a valid consent following an illegal detention may in some circumstances be admissible where the causal nexus with the original illegality is sufficiently attenuated, *State v. Phillips*, 140 Vt. 210, 218, 436 A.2d 746, 751 (1981), the voluntary nature of any consent that follows must necessarily be established by the State with clear and positive evidence. See *United States v. Sanchez-Jaramillo*, 637 F.2d 1094, 1099 (7th Cir. 1980) ("The government bears a heavy burden of demonstrating that consent given subsequent to an illegal detention was properly obtained."); *State v. Arroyo*, 796 P.2d 684, 687-88 (Utah 1990) ("When the prosecution attempts to prove voluntary consent after an illegal police action . . . the prosecution 'has a much heavier burden to satisfy than when proving consent to search' which does not follow police misconduct.") (quoting *United States v. Melendez-Gonzalez*, 727 F.2d 407, 414 (5th Cir. 1984)). Among the factors to consider are the "temporal proximity" of the illegal detention to the consent, and the presence of any "intervening circumstances" between the two events. *Sanchez-Jaramillo*, 637 F.2d at 1099 (citing *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)).

¶ 32.  The record here shows that defendant emptied his pockets solely in response to the officer's "request," which was based on the officer's stated concern that defendant not enter the police cruiser with any weapons. As with the immediately preceding "request" that defendant exit his vehicle, we discern no evidence that defendant's compliance was anything other than a submission to the officer's authority. Furthermore, there were no intervening events to attenuate the taint of the initial illegality. See *United States v. Jerez*, 108 F.3d 684, 695 (7th Cir. 1997) (illegal seizure "vitiated the appellants' subsequent consent" to search where consent "followed almost immediately after the illegal seizure" with "no intervening event of any significance"); *Sanchez-Jaramillo*, 637 F.2d at 1100 (defendant's acquiescence to officer's request that he open suitcase in the midst of illegal detention was not voluntary). The officer's "request" was made in the immediate aftermath — indeed virtually within seconds — of the illegal seizure, and was a direct exploitation of that illegality, as the sole basis for the request was to facilitate moving defendant from

---

[2] Although the trial court ruled that the consents to the search of defendant's person, car and home were voluntary, it did not consider the issue in the context of the immediately preceding illegal seizure resulting from the car exit.

outside of his vehicle — where he had been illegally removed — to inside the officer's cruiser. See *Royer*, 460 U.S. at 507-08 (exploitation of illegal detention was determinative factor in vitiating defendant's consent to search luggage). Hence we cannot conclude the State has carried its heavy burden of proving that the evidence obtained from defendant's pocket was " 'sufficiently an act of free will to purge the primary taint.' " *Brown*, 422 U.S. at 602 (quoting *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)).

¶ 33. The same must also be said of defendant's submission to the officer's subsequent requests to search his vehicle and home. As the police videotape graphically reveals, the officer utilized the small amount of marijuana illegally seized from defendant's pocket to leverage defendant's additional consent to search for more contraband in these additional locations. The coercive atmosphere and unequal tenor of these exchanges was plainly established by the initial detention and continuing seizure. As Justice Souter, speaking in a slightly different context, aptly observed: "The scene was set and an atmosphere of obligatory participation was established by this introduction. Later requests to search prefaced with 'Do you mind . . .' would naturally have been understood in the terms with which the encounter began." *United States v. Drayton*, 536 U.S. 194, 212, 122 S. Ct. 2105, 2116 (2002) (Souter, J., dissenting).

¶ 34. This is fundamentally a case about preserving personal freedom. The erosion of liberty is a slow, subtle process, and we are long gone down the road before a memory of what we used to have causes us to look back and notice our loss. Vermonters should be assured that when they are stopped for speeding the consequence is a ticket and a fine, not a license for law enforcement to exploit a temporary advantage. We hold that the trial court erred in denying defendant's motion to suppress, and therefore that the judgment must be reversed. Our decision renders it unnecessary to address defendant's other claims.[3]

*Reversed.*

¶ 35. **Amestoy, C.J.,** concurring. When the public's interest in the safety of its law enforcement officers is weighed against the relatively minor intrusion upon the privacy interest of a driver ordered out of a lawfully stopped vehicle, safety must prevail. Under the rule formulated by the United States Supreme Court in *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977), and endorsed by a majority of the states, a law enforcement officer may, consistent with the Fourth Amendment,

---

[3] We note that defendant did not argue below, or on appeal, that statutory authorization was necessary for the officer to remove a driver from his or her vehicle following an ordinary traffic stop, and we therefore need not consider this issue.

routinely require the driver to exit a lawfully stopped motor vehicle. This rule recognizes that a police officer approaching a vehicle stopped on the highway confronts grave risks, risks that — in the Supreme Court's judgment — outweigh any benefit to be derived from subjecting the encounter to after-the-fact judicial balancing. This is a judgment that I can readily appreciate.

¶ 36. Nevertheless, I agree with this Court's determination that our decisions have pointed in another direction, requiring some minimal showing of necessity for removing the driver from his or her vehicle following a routine traffic stop. As today's decision makes clear, and as I wish to emphasize, however, the threshold showing for such an exit order is relatively low. The test is simply whether a reasonably prudent officer in the circumstances would believe that removing the driver from the vehicle is necessary for the officer's safety or the safety of others, or that criminal activity in addition to the traffic violation requires further investigation.

¶ 37. Decisions applying similar tests from other states are instructive in this regard. In *Commonwealth v. Gonsalves*, 711 N.E.2d 108, 112-13 (Mass. 1999), the seminal decision of the Supreme Judicial Court of Massachusetts, the court emphasized that "[w]hile a mere hunch is not enough ... it does not take much for a police officer to establish a reasonable basis to justify an exit order or search based on safety concerns, and, if the basis is there, a court will uphold the order." In *Commonwealth v. Stampley*, 771 N.E.2d 784, 786 (Mass. 2002), a state trooper observed the driver and passengers of a stopped vehicle exhibit unusual physical behavior, which included the driver bending forward and reaching underneath the seat. In upholding the officer's exit order, the court explained that "[t]he justification for an exit order does not depend on the presence of an 'immediate threat' at the precise moment of the order, but rather on the safety concerns raised by the entire circumstances of the encounter." *Id.* at 789. Nor does conduct which can reasonably be interpreted as suspicious need additional corroboration. Sufficient justification for an exit order may be based on an occupant's bending or ducking briefly out of sight, or reaching in some direction. *Id.* at 788-89.

¶ 38. A court deciding whether a police officer was justified in ordering an occupant to step out of a vehicle must weigh the evidence "not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *United States v. Cortez*, 449 U.S. 411, 418 (1981); see *State v. Stone*, 170 Vt. 496, 507, 756 A.2d 785, 792 (2000) (Amestoy, C.J., dissenting) (evidence that defendant hindered law

enforcement officer must be viewed from "the predicament of an officer faced with the obligation to arrest an escapee in the remote area of a darkened parking lot"). "Routine" traffic stops appear that way only *after* the fact. An officer approaching a stopped vehicle on a roadside, generally alone and frequently isolated, does not at that moment know what may transpire. Accordingly, when a reasonably prudent police officer perceives facts creating a "heightened awareness of danger," *Stampley*, 771 N.E.2d at 787, ample discretion must be afforded the officer to remove a vehicle's occupants in order to better secure and control the situation. With this understanding, I concur in the judgment.

¶ 39.  **Dooley, J.**, concurring. I agree with the majority and join the opinion to make it the opinion of the Court. I write, however, to make two additional related points.

¶ 40.  First, there is an alternative way to reach the same result that is, to some extent, preferable. There is, in the many cases that reach us involving search and seizure, the unstated assumption that there are no limits on the powers of law enforcement officers except those we find are embodied in the Constitution. The corollary to this assumption is that neither the common law nor statutory law should be expected to play any significant role in the definition of those powers. I find the corollary and the assumption unfortunate. It discourages policy formulation in the legislative branch and constitutionalizes every decision, making it difficult to change.

¶ 41.  In fact, police officers, like deputy sheriffs, are "entrusted a portion of the sovereign authority of the State, and [their] duties are performed in the execution of the law, *in the exercise of power and authority bestowed by law.*" *Gross v. Gates*, 109 Vt. 156, 162, 194 A. 465, 468 (1937) (emphasis added); see also 20 V.S.A. § 1914 (state police have law enforcement power of sheriff). Much of the power of police officers is governed by the common law. See, e.g., *Holyoke Mut. Fire Ins. Co. v. Horton*, 100 Vt. 228, 231, 136 A. 385, 386 (1927). In the absence of power derived from the common law, an officer's actions must be authorized by statutory law. See *Mazzolini v. Gifford*, 90 Vt. 352, 354, 98 A. 904, 904 (1916) (because Legislature had not explicitly authorized arrest without a warrant for crime of selling goods on Sunday, arrest was unlawful).

¶ 42.  We have never defined the common law power of a police officer to order a motor vehicle operator to exit the motor vehicle and enter the police cruiser. Other state courts have, however, detailed this power. Thus, in *People v. Mickelson*, 380 P.2d 658, 660 (Cal. 1963), the California Supreme Court held: "If the circumstances warrant it, [the officer] may in self protection request a suspect to alight from an automobile or to submit

to a superficial search for concealed weapons." That statement, which is representative of decisions in the area, states the common law in terms very similar to our statement of the constitutional rule in this decision. It appears that the common law rule and the constitutional requirement are the same.

¶ 43. The Legislature has not addressed the question before us, at least in sufficient detail to form a grounds for our decision. Section 1012(a), (b) of Title 23 requires an operator who is stopped for a suspected motor vehicle violation to "give his or her name and address and the name and address of the owner of the motor vehicle" and to "produce his or her operator's license and the registration certificate for the motor vehicle." Section 1013 authorizes an enforcement officer to "make reasonable orders in enforcement of this title or to prevent or alleviate traffic congestion, property damage or personal injury." The general authorization for "reasonable orders" provides us little guidance and, in the absence of any justification, we would find that the order to exit was not reasonable in this case.

¶ 44. In short, we can reach the same result without invoking the Vermont Constitution and leave more flexibility to the Legislature for a response.

¶ 45. My second point is that there is an additional, different constitutional problem related to exit orders. It is apparent from the large volume of incidents that give rise to the use of exit orders. The Vermont Judicial Bureau opened 113,734 cases in fiscal year 2002, over 110,000 of which were based on traffic tickets. This means that the facts of this case, at least up until the discovery of the drugs, were replicated thousands and thousands of times during the course of the year. In many of those cases, the officer ordered the driver, and possibly the passenger(s), to exit from the vehicle; in many, the officer did not order an exit. This record suggests there was no clear standard for that choice; it is based on the officer's judgment. The record also suggests that the intrusiveness of the encounter will increase if there is an exit order since it may involve a search of the vehicle operator.

¶ 46. I do not think case-by-case adjudication will work well to develop the law in this context. The weakness of a case-by-case adjudication approach has been described by one commentator:

> Both the authority of law enforcement officers to engage in certain activities and the limits on that authority might be developed in case law. Perhaps, however, this method is unacceptably ineffective and expensive. It may not produce the comprehensive guidelines necessary to acceptable

administration of police authority. Or, if the case law does produce comprehensive guidelines, it may accomplish this only after a prolonged period of uncertainty during which the authority is exercised within insufficient limits. To the extent that the case law method contains these defects, legislative action may be both desirable and constitutionally necessary.

G. Dix, *Nonarrest Investigatory Detentions in Search and Seizure Law*, 1985 Duke L.J. 849, 912 (1985). This has been the criticism of the decision in *Commonwealth v. Gonsalves*, 711 N.E.2d 108 (Mass. 1999). See A. Small, *Developments in State Constitutional Law: 1999*, 31 Rutgers L.J. 1383, 1393-95 (2000).

¶ 47.  Chief Justice Amestoy has attempted to avoid the deficiency of case-by-case adjudication by describing the burden to justify an exit order as very light. I am skeptical that this attempt will be entirely successful, as *Gonsalves* itself demonstrates. *Gonsalves* involves a passenger who was stopped in a taxicab at night. The events unfolded as follows:

> In the course of questioning the driver, the trooper trained his flashlight on the occupants of the car, something which he routinely did on such stops for his personal safety. The trooper thought the defendant was extremely nervous. His hands were trembling and moving from his lap to the seat and back to his lap again, and he appeared to be breathing heavily. Because the defendant appeared nervous, the trooper ordered him to step out of the taxi.

711 N.E.2d at 110. Unlike this case, where the officer pointed to no facts to justify the exit order, *Gonsalves* represents a judgment that some facts are not enough, a judgment that may not be easy to apply.

¶ 48.  More important, the constitutional requirement which we will shape on a case-by-case basis does not address the uniformity of application of any use of exit orders. With over 100,000 traffic stops per year, I believe we have to be concerned how discretion to order this additional seizure is exercised. In many respects, the situation is comparable to DUI roadblocks, where we recognized that we were balancing the public's safety interest against the privacy interest of motorists. See *State v. Martin*, 145 Vt. 562, 568, 496 A.2d 442, 446-47 (1985). This Court upheld roadblocks if they met a number of criteria:

> In addressing the constitutionality of a particular DUI roadblock, the trial court should review the roadblock's characteristics so that when it balances the degree to which the

roadblock serves the public interest against the degree to which it intrudes upon an individual's privacy, it will be better able to analyze which criteria it must consider and how much weight it should give to each one in deciding whether a roadblock has sustained all Fourth Amendment challenges. As a general rule, a DUI roadblock will pass constitutional muster if: (1) the initial stop and the contact between the officers in the field and the motorist involves an explanation of the nature of the roadblock and minimal detention of a nonimpaired driver; (2) the discretion of the officers in the field, as to the method to be utilized in selecting vehicles to be stopped, is carefully circumscribed by clear objective guidelines established by a high level administrative official; (3) the guidelines are followed in the operation of the roadblock; (4) approaching drivers are given adequate warning that there is a roadblock ahead; (5) the likelihood of apprehension, fear or surprise is dispelled by a visible display of legitimate police authority at the roadblock; and (6) vehicles are stopped on a systematic, nonrandom basis that shows drivers they are not being singled out for arbitrary reasons.

*Id.* at 571, 496 A.2d at 448. We applied the same standards under Article 11. See *State v. Record,* 150 Vt. 84, 88, 548 A.2d 422, 425 (1988); see also *State v. Berard,* 154 Vt. 306, 314, 576 A.2d 118, 122 (1990) ("clear, objective guidelines" required by Article 11 for random searches of prison cells). I am not suggesting that all of the roadblock criteria are necessary for exit orders. I do think the requirement of "clear, objective guidelines" is applicable.

¶ 49. I have made these two points together because I believe the issue before us is better resolved by the legislative and executive branches because they are in the position to develop clear, objective guidelines for the use of exit orders that are much preferable to our case-by-case adjudication and much preferable to continuing constitutional development in this area. Of course, if these branches develop an authorization that conflicts with Article 11, we have to enforce the constitutional requirement. We should, however, give these branches room to develop a workable balance between officer safety, and the need to investigate suspected criminal activity, and the privacy interests of the operator and passengers.