IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MARVIN DAVIS, | § | |
| | § | |
| Defendant-Below | § | No. 419, 2022 |
| Appellant, | § | |
| | § | Court Below—Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID No. 2103008825A/B (N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Appellee. | § | |

Submitted: September 13, 2023
Decided: November 8, 2023

Before **SEITZ**, Chief Justice; **VALIHURA, TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices constituting the Court *en banc*.

## **ORDER**

This 8th day of November, 2023, after careful consideration of the parties' briefs, the argument of counsel, and the record on appeal, it appears to the Court that:

(1) On March 14, 2020, at approximately 9:30 p.m., Trooper Evans of the Delaware State Police, while patrolling near Churchman's Road in Newark, observed a white Mercury sedan driven by Marvin Davis. Running a DELJIS[1] inquiry on the vehicle, Trooper Evans discovered that Davis's car, which was transferred 10 days earlier, was not properly registered. Consequently, he initiated

---

[1] "DELJIS" is an acronym for the Delaware Criminal Justice Information System.

a traffic stop to address the registration violation. Trooper Evans initially stood outside Davis's front passenger window and asked Davis, the sole occupant of the vehicle, for his license, registration, and insurance. After Davis advised that he had a learner's permit and that he had just purchased the car from a friend, Trooper Evans told him the reason for the stop—the registration violation—and Davis replied that he was aware that he needed to re-register the vehicle in his name.

(2) When Davis handed his paperwork to Trooper Evans, Evans saw Davis's arm shaking. He then asked Davis why he was in the area and where he lived. After returning the papers, Trooper Evans noted that Davis was taking rapid, shallow breaths.

(3) Although Davis answered all Trooper Evans's questions and was generally cooperative, Trooper Evans asked Davis to step out of the car. The trooper described the exit order as "pretty routine"[2] and a practice he follows during "almost every traffic stop"[3] he conducts. In Trooper Evans's words, "[w]hen I pull them out of the vehicle, I conduct a brief . . . pat-down of the exterior to make sure there's no knives or firearms. . . ."[4]

---

[2] App. to Opening Br. at A77.
[3] *Id*. at A79.
[4] *Id*. at A101.

2

(4)     When Davis began "to adjust in his seat to get out of the car,"[5]   Trooper Evans saw that he was sitting on what appeared to be a handgun magazine protruding beneath his right leg.  Trooper Evans then ordered Davis to put his hands up, drew his service pistol, and asked if there was a gun under Davis's leg.

(5)     Davis, who denied having a gun, failed to comply with repeated orders to put his hands up.  Davis was held at gunpoint until assisting officers arrived on the scene, at which point he was taken into custody without incident.  Trooper Evans then collected the firearm located on Davis's driver's seat; the handgun, loaded with 14 rounds of ammunition, had a round in the chamber.  Soon after, Trooper Evans asked Davis if he understood how close he came to getting shot.  He then allowed Davis to call someone to pick up his car to avoid having it towed.  While on the phone, Davis told the person he called that he had a firearm in his possession.

(6)     Davis was indicted on three felony charges: carrying a concealed deadly weapon, possession of a firearm by a person prohibited, and possession of ammunition by a person prohibited.

(7)     Before trial, Davis moved to suppress all evidence seized during the traffic stop, including the handgun found on the driver's side seat and Davis's statements to Trooper Evans.  His motion advanced four arguments.  First, Davis contended that Trooper Evans impermissibly extended the traffic stop without

---

[5] *Id*. at A81.

sufficient justification unrelated to the initial motor vehicle infraction in violation of this Court's holding in *Caldwell v. State*.[6] Second, Davis argued that the United States Supreme Court's interpretation of the Fourth Amendment in *Pennsylvania v. Mimms*,[7] which condoned the use of exit orders during traffic stops in the absence of an articulable suspicion of criminal activity or actual danger, should not be extended to stops "when the police action is taken in order to investigate an additional crime (other than the traffic offence [sic] for which the stop was initiated)."[8] Third, even if *Mimms* were controlling under the Fourth Amendment to the United States Constitution, according to Davis, Delaware courts should afford broader protection from automatic exit orders under Article I, § 6 of the Delaware Constitution. Similar—but not identical—to the Fourth Amendment, Article I, § 6 recognizes the right of "[t]he people . . . [to] be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures[.]" But importantly for present purposes, this Court has concluded that Article I, § 6 reflects different and broader protections than those guaranteed by the Fourth Amendment. Fourth, Davis asserted that Trooper Evans's failure to notify Davis of his *Miranda* rights before questioning him violated "his constitutional right against self-incrimination."[9]

---

[6] 780 A.2d 1037 (Del. 2001).
[7] 434 U.S. 106 (1977).
[8] App. to Opening Br. at A23.
[9] *Id*. at A29.

4

(8)    In the trial court's bench ruling following a suppression hearing, the court identified "two challenges in [Davis's] motion to suppress: [o]ne, that Trooper Evans unlawfully extended the motor vehicle stop; and, two, the statements made after defendant's arrest should be suppressed under *Miranda v*[.] *Arizona*. . . ."[10] The court did not mention Davis's argument under Article I, § 6.

(9)    The Superior Court rejected Davis's *Miranda* claim, a ruling that Davis has not appealed.

(10)    Addressing Davis's claim that Trooper Evans had unlawfully extended the vehicle stop for reasons unrelated to the motor vehicle violation, the court quoted heavily from this Court's opinion in *Caldwell*:

> In order to be valid under the Fourth Amendment "the stop and inquiry must be justified at its inception by reasonable suspicion of criminal activity." That's *Caldwell v*[.] *State*, 780 A.2d 1037[, 1046], Supreme Court of Delaware 2001. . . . "Once the officer has issued a citation or warning and has run routine checks, the vehicle must be released unless the driver voluntarily consents to further questioning or the officer uncovers facts that independently warrant additional investigation." [*Id.* at 1047].[11]

(11)    The court also noted that, under *Arizona v. Johnson*, Trooper Evans's questioning of Davis about matters unrelated to the registration violation would not "convert the encounter into something other than a lawful seizure, as long as those

---

[10] Opening Br. Ex. A at 83.
[11] *Id.* at 83–84.

inquiries do not measurably extend the duration of the stop."[12] Noting that only one minute and 13 seconds elapsed between Trooper Evans's knocking on Davis's passenger side window and his ordering Davis out of the car, the court found that the trooper's pre-exit order questioning did not measurably extend the stop. Based on this finding and the court's determination that the questioning did not stray "beyond what is required and permitted to complete the traffic stop,"[13] the court rejected Davis's *Caldwell* claim.

(12) The court addressed the exit order next and determined that it was permissible "under [the] Fourth Amendment,"[14] citing this Court's ruling in *Loper v. State*.[15] In *Loper*, this Court addressed a claim that an exit order following a traffic stop issued after a passenger in Loper's car was arrested on an outstanding capias constituted a "second seizure" requiring suspicion independent of the suspicion justifying the stop. Loper grounded his argument on the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and Article I, § 6 of the Delaware Constitution. Apparently recognizing that his argument ran contrary to the United States Supreme Court's decision in *Mimms*, Loper argued that Article I, § 6 provided greater protection from unreasonable search and seizures than did the

---

[12]  *Id*. at 84 (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)).
[13] Opening Br. Ex. A at 88.
[14] *Id.* at 89.
[15] 8 A.3d 1169 (2010).

Fourth Amendment, a general principle this Court recognized in *Jones v. State*.[16]

The Court rejected Loper's state constitutional claim, deferring instead to *Mimms*'s

Fourth Amendment analysis:

> As the United States Supreme Court held in *Pennsylvania v. Mimms*, the police may order the driver or a passenger to exit the car after a valid traffic stop, and that order is not a "seizure" under the Fourth Amendment. Loper has cited no authority, nor made any cogent legal argument, for why this Court should expand the meaning of "seizure" under *Jones* and Article 1, § 6 of the Delaware Constitution, to hold that a person already being lawfully detained as a result of a valid traffic stop is "seized" a second time when ordered to leave his car. The constitutional claim, therefore, fails.[17]

(13) Based upon the Court's exclusive reliance on *Mimms* in the passage

from *Loper* quoted above, in this case, Davis pressed the trial court to consider his

challenge to the exit order, without which the weapon would not have been

discovered, under the broader protection from unreasonable searches and seizures

under Article I, § 6. Unlike the defendant in *Loper*, Davis devoted six pages of his

motion to suppress to his state constitutional claim, explaining why legislative

history, pre-existing state law, and state and local concerns weighed in favor of a

more expansive reading of Article I, § 6 than the United States Supreme Court

---

[16] 745 A.2d 856 (1999).
[17] *Loper*, 8 A.3d at 1174.

afforded the Fourth Amendment in *Mimms*.[18] Davis also cited opinions from other states that refused to endorse automatic exit orders under their state constitutions.[19]

(14) In the State's Response to Defendant's Motion to Suppress, the State did not squarely address Davis's state constitutional arguments, relying instead on "*Mimms* and its state-law progeny,"[20] *i.e.*, *Loper*.

(15) Despite Davis's framing of the state constitutional law issue in the manner that this Court has encouraged,[21] the Superior Court did not address it. The following exchange at the conclusion of the court's bench ruling leaves no doubt that its decision was based on its application of the Fourth Amendment as interpreted in *Mimms*:

> THE COURT: Does anybody have any questions?
>
> DEFENSE COUNSEL: I do, Your Honor. Defense also made an argument under the Delaware Constitution, the State didn't . . . respond to that.
>
> THE COURT: ***I'm not going to take up that issue at this time. I found that under the United States Constitution that it's satisfied.*** If the State wants to make any additional arguments about that now[?]
>
> THE STATE: No, Your Honor.
>
> . . .

---

[18] App. to Opening Br. at A23–29.
[19] *Com. v. Gonsalves*, 711 N.E.2d 108 (Mass. 1999); *State v. Sprague*, 824 A.2d 539 (Vt. 2003); *State v. Kim*, 711 P.2d 1291 (Haw. 1985).
[20] App. to Opening Br. at A50.
[21] *See infra* ¶ 19.

8

DEFENSE COUNSEL: I want to make sure that it's been preserved, that the defendant has raised it and the Court has decided not to address [it].

THE COURT: That's acknowledged. I saw it in your papers, and it is acknowledged. Thank you.[22]

(16) In consequence of its rulings that (i) Trooper Evans's roadside questioning of Davis did not measurably extend the duration of the stop, (ii) the exit order was permissible under *Mimms*, and (iii) there was no *Miranda* violation, the Superior Court denied Davis's motion to suppress.

(17) Davis was tried before a jury and convicted of the three weapons charges. After the State moved to declare Davis a habitual offender, Davis was sentenced to 23 years of incarceration followed by probation, and he appealed.

(18) On appeal, Davis does not challenge the Superior Court's denial of his motion to suppress to the extent that it was based on the court's consideration of federal constitutional protections. Instead, he argues that the Superior Court erred by not ruling on his claim that Trooper Evans's exit order violated his rights under Article I, § 6 of the Delaware Constitution. That section, according to Davis, prohibits exit orders and consequent frisks in the absence of "individualized reasoning and articulable facts . . . justify[ing] the additional seizure . . . " effected

---

[22] App. to Opening Br. at A152–53 (emphasis added).

9

by the exit order.[23]  Davis contends that the court's failure to address this state constitutional claim at all constitutes reversible error.  We agree.

(19)  In *Ortiz v. State*, this Court observed that "[t]he proper presentation of an alleged violation of the Delaware Constitution should include a discussion and analysis of one or more of the criteria set forth in *Jones* [*v. State*][24] or other applicable criteria."[25]  The *Jones* criteria, which are non-exclusive, comprise textual language, legislative history, pre-existing state law, structural differences, matters of particular state interest or local concern, state traditions, and public attitudes.  Davis's motion discussed and analyzed three of these eight criteria; it also cited cases from other jurisdictions, based upon provisions in their state constitutions, that have refused to limit their scrutiny of exit orders to what *Pennsylvania v. Mimms* requires.[26]  Thus, the legal issue and the factual questions related to it were squarely in front of the court.  And yet the Superior Court did not address the issue, even when Davis raised it again after the court failed to rule on the issue in its bench ruling.

(20)  As this Court noted in *Holden v. State*, "[o]ur case law mandates that a trial judge make factual determinations and supply a legal rationale for a judicial

---

[23] Opening Br. at 10.
[24] 745 A.2d 856, 864–65 (Del. 1999).
[25] 869 A.2d 285 (Del. 2005).
[26] *See supra* note 19.

10

decision as a matter of law. Failure to do so may be an abuse of discretion."[27] Here, the trial court did not explain its legal rationale for denying Davis's state constitutional claim. That failure was an abuse of discretion. Not only this, but without the court's legal rationale, we cannot discern the extent to which factual determinations were required to fairly adjudicate Davis's motion. For instance, had the court held that, unlike the Fourth Amendment as applied in *Mimms*, Article I, § 6 requires a showing of an actual safety concern to justify an exit order for the purpose of frisking a traffic-law offender, the court would have been compelled to weigh Trooper Evans's actual safety concerns. No doubt, this inquiry would have required careful analysis, given Trooper Evans's testimony that he routinely uses exit orders followed by pat-downs in "almost every traffic stop."[28] This testimony in turn raises factual questions concerning the existence of Delaware State Police policies addressing the use of exit orders, including whether such policies, if they exist, are uniformly followed. We rightfully commit factual inquiries of this nature to the experience and expertise of our trial courts.

(21) We note, moreover, that Davis's suppression motion challenged *Mimms*'s factual underpinning—that traffic stops pose an "inordinate risk"[29] to police officers that justifies what the Court deemed to be the *de minimis* intrusion

---

[27] *Holden v. State*, 23 A.3d 843, 846 (Del. 2011) (footnotes omitted).
[28] App. to Opening Br. at A77, A79, A101.
[29] *Mimms*, 434 U.S. at 110.

11

into a motorist's personal liberty that an exit-order causes. A determination whether the *Mimms* approach to exit orders comports with Article I, § 6's protections requires a thoughtful, evidence-based consideration of these factual assumptions underlying the *Mimms* majority's analysis.

(22)  In short, the important state constitutional claim Davis has raised deserved full and fair consideration by the trial court in this case.

NOW, THEREFORE, IT IS ORDERED that this matter be remanded to the Superior Court for further proceedings consistent with this order. Jurisdiction is retained.[30]

BY THE COURT:

*/s/ Gary F. Traynor*
Justice

---

[30] In accordance with Supreme Court Rule 19(c), a certified copy of this order shall issue. The Superior Court shall issue its decision and file the same within 120 days of the issuance of the certified copy of this order. If it shall not be feasible for the Superior Court to issue its decision within the time provided above, it shall file a status report within such time.

12