2008 VT 110

# In re Appeal of JAM Golf, LLC

[969 A.2d 47]

No. 06-307

Present: **Reiber, C.J., Johnson, Skoglund and Burgess, JJ., and Reiss, D.J., Specially Assigned**

Opinion Filed August 22, 2008

Motion for Reargument Denied December 8, 2008

*William Alexander Fead* of *Fead Construction Law, PLC,* Burlington, for Appellant.

*Amanda S. E. Lafferty* of *Stitzel, Page & Fletcher P.C.,* Burlington, for Appellee.

¶ 1. **Burgess, J.** Property owner JAM Golf, LLC (applicant) appeals the Environmental Court's denial of a permit for a proposed ten-lot subdivision in South Burlington. Applicant raises four issues on appeal, claiming the court erred by: (1) admitting expert testimony concerning wildlife corridors; (2) concluding that the project did not protect wildlife habitat or scenic views; (3) finding that the project did not conform to the city plan; and (4) denying the project a permit, rather than remanding the case to the development review board. We reverse the court's conclusion and remand for further findings under § 26.151 of the South Burlington Zoning Ordinance.

¶ 2. Applicant owns part of a 450-acre planned residential development (PRD) known as the Vermont National Country Club. The property is located in the Southeast Quadrant Zone ("Quadrant") of South Burlington. The parcel is permitted for 296 residential units, as well as for an eighteen-hole golf course. Applicant sought to obtain permits for ten additional lots on an approximately seven-acre portion of the development known as "the woodland."

¶ 3. The woodland sits on a ridge in the golf course and is bounded by three fairways and by another residential development. Several species of hard-mast-producing trees,[1] including hickory, butternut, beach, and tall pines, populate the woodland. The grounds contain shrubs, saplings, and berry patches. Wildlife experts directly observed or noted evidence of deer, fox, turkey, raccoon, squirrel, rabbit, other rodents, and birds in the woodland. The woodland is also adjacent to wetlands and an open space located on the golf course.

---

[1] Hard mast trees produce nuts, a food source high in nutritional value for wildlife.

¶ 4. Applicant applied to the board to amend the current PRD to accommodate ten additional lots in the woodland. The board denied the application, and applicant appealed this denial to the Environmental Court. Four years later, in a six-page decision, the court denied the application without prejudice.[2] The court held that the project did not satisfy the mandate of § 26.151(g) requiring that PRDs "protect important natural resources including . . . scenic views" and "wildlife habitats." In addition, the court concluded that the project violated § 26.151(l), which requires that the amended PRD conform to the city plan. The city plan for the Quadrant requires residential developments to protect wildlife habitat, and the court concluded that the applicant failed to do so here. This appeal followed.

¶ 5. On appeal, applicant claims that: (1) expert testimony concerning wildlife corridors was inadmissible, because the testimony was unreliable; (2) the record does not support the court's conclusion that the project does not protect wildlife habitats; (3) the record does not support the court's conclusion that the project does not protect scenic views; (4) the city plan is not sufficiently specific to be enforceable; and (5) the court should have remanded the application to the board for guidance instead of denying the application.

I.

¶ 6. Applicant contends that the Environmental Court erred in admitting testimony from South Burlington's wildlife expert concerning wildlife corridors. Specifically, applicant faults the court for not making specific findings of reliability necessary under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Had the court conducted the inquiry, applicant maintains, the court would have found the testimony unreliable and thus inadmissible.

¶ 7. Under Vermont Rule of Evidence 702, expert testimony will only be admitted if it " 'assist[s] the trier of fact to understand the evidence or to determine a fact in issue,' " and if: " '(1)

---

[2] Loathe to aggravate what already appears to have been an extreme delay in reaching a decision at the trial level, we regret having to remand, but nevertheless find a remand necessary for further findings based on the existing record evidence as to whether or not the proposed project satisfies the remaining § 26.151 PRD criteria yet to be addressed by the trial court.

the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.'" *985 Assocs. v. Daewoo Elec. Am., Inc.,* 2008 VT 14, ¶ 6, 183 Vt. 208, 945 A.2d 381 (quoting V.R.E. 702). Accordingly, trial courts act as "gatekeepers who screen expert testimony ensuring that it is reliable." *USGen New England, Inc. v. Town of Rockingham,* 2004 VT 90, ¶ 19, 177 Vt. 193, 862 A.2d 269.

■■■ ¶ 8. To be reliable, expert testimony must be supported by "scientific knowledge." *Daubert,* 509 U.S. at 589. The Court in *Daubert* defined the adjective "scientific" as "ground[ed] in the methods and procedures of science," and stated that "knowledge" must be more than a subjective belief or speculation. *Daubert,* 509 U.S. at 590. In determining whether expert testimony is "reliable," trial courts may consider such factors as: (1) whether the scientific technique can be tested; (2) whether the technique was peer reviewed; (3) any potential error associated with the technique; and (4) whether the technique was generally accepted in the scientific community. *USGen New England,* 2004 VT 90, ¶ 16. This list is not exhaustive, however, and the Rule 702 admissibility standard is flexible. *Id.* In addition, in the context of bench trials, the trial court's gatekeeper function is not as crucial because it "'requires a binary choice — admit or exclude[;] . . . a judge in a bench trial should have discretion to admit questionable technical evidence, though of course he must not give it more weight than it deserves.'" *Id.* ¶ 26 (quoting *Smithkline Beecham Corp. v. Apotex Corp.,* 247 F. Supp. 2d 1011, 1042 (N.D. Ill. 2003)). We review Rule 702 determinations for abuse of discretion. *Id.* ¶ 21.

■■■ ¶ 9. Applicant claims that the testimony of the City's expert, Mr. Parsons, is unreliable, because it rested on his speculative and subjective beliefs rather than on "scientific knowledge." Applicant cites Mr. Parsons' qualification of his testimony concerning wildlife corridors as "preliminary," "potential," and "hypothetical." Applicant essentially asserts that all such testimony is per se unreliable. Applicant misconstrues the standard. Expert testimony "does not alone have to meet the proponent's burden of proof" to be admissible. *USGen New England,* 2004 VT 90, ¶ 19. In order to tease out deficiencies of expert testimony, opponents should attack testimony of this nature through the adversarial process. *Daewoo,* 2008 VT 14, ¶ 16.

■ ¶ 10. Despite the "hypothetical" nature of some of Mr. Parsons' testimony, we conclude that the testimony was reliable for the purposes of *Daubert*, because the testimony was based on the type of facts and data with which wildlife experts are familiar — topographic features and wildlife movement patterns. As a wildlife expert, Mr. Parsons is accorded the authority to interpret and rely on such technical information, even if he has not observed it firsthand. V.R.E. 703; *Daubert*, 509 U.S. at 594. Mr. Parsons' conclusions were not speculative but instead were "based on what is known." *Daubert*, 509 U.S. at 590. In this case, Mr. Parsons relied on the topography of the woodland, the close proximity of major roads, the presence of cover, his observation of wildlife and their nests, dens and scat on the parcel, and the typical movement patterns of common wildlife on the land to offer an opinion that the woodland sat in a "potential" wildlife corridor. According to Mr. Parsons, these methods are used by other scientists, including those employed by governmental entities that map and protect wildlife corridors based on aerial photographs and topographic maps. The general use of Mr. Parsons' methods suggests they are a reliable technique to identify "potential" wildlife corridors. See *USGen New England*, 2004 VT 90, ¶ 16.

■ ¶ 11. While we agree with applicant that this testimony is not dispositive as to whether wildlife actually use the woodland as a corridor, we cannot conclude that Mr. Parsons' testimony is the kind of "junk science" that *Daubert* meant to exclude. *Daewoo*, 2008 VT 14, ¶ 8. In finding evidence to be reliable, the trial court is not expected to make a substantive decision on the merits of the proponent's argument but is instead required to make an "inquiry into the factual basis and methodology" used by the expert witness. *Id.* ¶ 11. Because Mr. Parsons offered a sufficient basis for his testimony, we cannot conclude that the court abused its discretion by admitting it as evidence.

## II.

¶ 12. Applicant next claims that the Environmental Court erred in concluding that the project does not satisfy § 26.151(g) of the zoning ordinance, which requires PRD designs to "protect important natural resources including streams, wetlands, scenic views, wildlife habitats and special features such as mature maple groves or unique geologic features." Applicant challenges both the court's

interpretation of the ordinance and its underlying findings of fact. Specifically, applicant asserts that § 26.151(g): (1) requires that PRD designs "protect" only *important* wildlife habitat and scenic views; and (2) allows developers to offer mitigation in order to meet this requirement. Applicant complains that the habitat and view at issue here are not, and cannot be, considered "important" from the court's findings.

¶ 13. Unfortunately, the ordinance as written is essentially standardless. Although applicant challenges the court's interpretation of the ordinance, rather than attacking the ordinance itself, § 26.151 is flawed, since it provides no standards for the court to apply in determining what would constitute a failure to "protect" the listed resources. Zoning ordinances must "specify sufficient conditions and safeguards" to guide applicants and decisionmakers. *Town of Westford v. Kilburn*, 131 Vt. 120, 122, 300 A.2d 523, 525 (1973). We will not uphold a statute that "fail[s] to provide adequate guidance," thus leading to "unbridled discrimination" by the court and the planning board charged with its interpretation. *Id.* at 125, 300 A.2d at 526; see also *In re Handy*, 171 Vt. 336, 348-49, 764 A.2d 1226, 1238 (2000); *State v. Chambers*, 144 Vt. 234, 239, 477 A.2d 110, 112-13 (1984).

¶ 14. "Protect," as defined in § 26.151, cannot be the equivalent of total preservation, because the same regulations allow for development, which, by necessity, must reduce wildlife habitat and affect scenic views. How much less than total preservation qualifies as sufficient protection, however, we cannot know, because the regulations do not say. Even had the trial court endeavored to apply a "reasonableness" measure to this term, § 26.151 would be unworkable. The language of the regulations offers no guidance as to what degree of preservation short of destruction is acceptable under the statute. From a regulatory standpoint, therefore, § 26.151(g) provides no guidance as to what may be fairly expected from landowners who own a parcel containing wildlife habitat or scenic views — both common situations in Vermont — and who wish to develop their property into a PRD. Such standardless discretion violates property owners' due process rights. *In re Miserocchi*, 170 Vt. 320, 325, 749 A.2d 607, 611 (2000). We thus strike this provision of the ordinance and reverse the Environmental Court's conclusion that the project fails to meet its requirements.

## III.

¶ 15. Applicant next claims that the court erred in denying its application for failure to comply with the city plan. Applicant makes three distinct arguments: (1) the Vermont Planning and Development Act does not authorize towns to require that subdivisions and PRDs conform with city plans; (2) the city plan is vague and unenforceable; and (3) the application conformed to the city plan.

¶ 16. First, applicant asserts that the enabling statute, 24 V.S.A. § 4411, does not authorize towns to mandate that development follow the city plan. While this is true, neither does Title 24 prohibit towns from enforcing such a requirement. We note that 24 V.S.A. § 4410 grants broad authority to towns to implement their plan through zoning bylaws:

> A municipality that has adopted a plan through its bylaws may define and regulate land development in any manner that the municipality establishes in its bylaws, provided those bylaws are in conformance with the plan and are adopted for the purposes set forth in section 4302 of this title. In its bylaws, a municipality may utilize any or all of the tools provided in this subchapter and any other regulatory tools or methods not specifically listed.

This section speaks in permissive terms. Towns may implement their plans through "any . . . regulatory tools or methods not specifically listed," so long as the "bylaws are in conformance with the plan." Here, the City has chosen to incorporate the city plan into its bylaws. See § 26.151(l) (a PRD "will [c]onform with the City's Comprehensive Plan"). Due to the broad authority granted to towns to implement their city plans, we cannot conclude that § 26.151 is an unauthorized method of zoning regulation.

¶ 17. Nevertheless, all ordinances are subject to the limits of our Constitution, and we will not enforce laws that are vague or those that delegate standardless discretion to town zoning boards. *Handy*, 171 Vt. at 348-49, 764 A.2d at 1237-38. This brings us to applicant's next argument — that the city plan is not sufficiently specific to be enforceable. While cities may require subdivisions to conform to their city plan, as here, city authorities may not deny permission for a project when there is not a

"specific policy set forth in the plan . . . stated in language that is clear and unqualified, and creates no ambiguity." *In re John A. Russell Corp.*, 2003 VT 93, ¶ 16, 176 Vt. 520, 838 A.2d 906 (mem.) (citation and quotation omitted). A city plan must contain "specific standards" to guide enforcement to be given regulatory force. *Id.*

 ¶ 18. In this case, we find no specific standards to guide enforcement. The Environmental Court concluded that the city plan "requires residential development to be designed to protect wildlife corridors and habitat, and to protect scenic views." While the city does specifically identify some generic natural resources to be protected — such as scenic views — the city plan fails to define what in particular is to be protected, and provides no standards as to how or when development should be restricted to accomplish protection. At best, in this regard, the zoning scheme is confusing. For example, although the city's official zoning map specifically labels certain areas of the Quadrant as "important scenic views," the view deemed scenic by the Environmental Court in this case was not so designated by the city. The ordinance cannot leave such designations to the unfettered discretion of the Environmental Court. See *Handy*, 171 Vt. at 349, 764 A.2d at 1238.

¶ 19. The city plan also lays out a general policy of promoting growth and residential development in the Quadrant that is at odds with the notion of complete preservation of the status quo. This growth-oriented policy is in tension with the goal of protecting natural resources, and the city plan provides insufficient guidance as to how the board or a landowner should balance these competing concerns when applying for or evaluating a permit application. As a result, this aspect of the city plan is too ambiguous to be enforceable. We therefore strike this provision of the ordinance, and reverse the Environmental Court's conclusion that the project does not satisfy § 26.151(1).[3]

*Reversed and remanded for the Environmental Court to make findings on the remaining § 26.151 criteria.*

---

[3] Applicant also claims that the project conforms to the city plan, and challenges the Environmental Court's decision to deny the permit instead of issuing a conditional permit. Because we conclude that the city plan contains insufficient standards to be enforceable, and remand for further findings on the other § 26.151 criteria, we need not address these remaining arguments.