2010 VT 64

# State of Vermont v. Kent W. Burgess

[5 A.3d 911]

Nos. 09-103 & 09-104

Present: Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.

Opinion Filed July 2, 2010

*Stuart G. Schurr*, Department of State's Attorneys, Montpelier, for Plaintiff-Appellee/Cross-Appellant.

*Paul S. Volk* of *Blodgett, Watts, Volk & Sawyer, P.C.,* Burlington, for Defendant-Appellant/Cross-Appellee.

¶ 1. **Reiber, C.J.** This appeal and cross-appeal stem from consolidated civil suspension and criminal proceedings against defendant for driving under the influence (DUI). Defendant appeals the trial court's final ruling against him in the civil suspension case, and the State appeals the court's interlocutory ruling suppressing the Datamaster breathalyzer test results in the criminal case. Defendant argues that the civil suspension hearing should have been dismissed because: (1) the exit order was not justified by a reasonable suspicion of DUI; and (2) the trial court improperly applied a statutory presumption in reaching its ruling in the civil suspension hearing. The State contests these issues and, as cross-appellant, argues that the trial court erred in excluding the Datamaster breathalyzer test results from the criminal case. We affirm the trial court's ruling on the civil suspension hearing and reverse the trial court's grant of defendant's motion to suppress the Datamaster breathalyzer test results in the criminal case.

¶ 2. At 1:51 a.m. on November 24, 2007, defendant was driving east on Vermont Route 15 and passed a state trooper traveling in the opposite direction. The trooper clocked defendant going 65 in a 50-mile-per-hour zone. The trooper briefly flashed his blue lights, turned around, caught up with defendant, and followed him for approximately half of a mile before turning his blue lights back on and pulling over defendant. The trooper did not observe any erratic driving while he was following defendant. The trooper was, however, surprised that: (1) defendant did not stop when the trooper first flashed his lights; and (2) when defendant did pull over, he did not pull entirely off the road, but instead remained

partially within the lane of the road. Defendant argues that he did not know the trooper was pulling him over at first and that his failure to pull entirely off the road is explained by the fact that snowfall had covered the lines of the road and that the shoulder of that section of road was particularly narrow.

¶ 3. After approaching defendant's vehicle, the trooper observed a "moderate odor of alcohol" coming from "within the truck." He could not say whether the alcohol came from defendant, although defendant was the only person in the truck at the time. The trooper noticed that defendant's eyes were watery, but they were not bloodshot. The trooper also noticed that there were two unopened bottles of beer in the vehicle, one in the console and one visibly protruding from the pocket of the jacket that defendant was wearing.[1] In response to questioning from the trooper, defendant stated that he was coming from a party and admitted that he had consumed one drink "20 minutes ago."

¶ 4. Suspecting that defendant was intoxicated, the trooper ordered defendant to pull into a nearby driveway and exit his vehicle. The trooper then conducted field sobriety tests. Defendant failed several of those tests. The trooper asked defendant to submit to a preliminary breath test (PBT), and defendant stated that he did not know whether he should take it. When defendant finally agreed to submit to a PBT, the trooper refused to allow the test and arrested defendant because, according to the trooper, he already "had enough clues to ask for an evidentiary test at that point." After being arrested, defendant was brought to a police station and, roughly two hours and eight minutes since last operating his vehicle, he was given a Datamaster breathalyzer test, indicating a blood alcohol content (BAC) of 0.126 at 3:59 a.m. and 0.117 at 4:02 a.m. The State has stipulated that these test results were "generated outside two hours from the time of operation."

¶ 5. In the proceedings before the trial court, defendant filed motions to suppress and dismiss. The court held a hearing, which involved two main issues. One part of the hearing addressed the appropriateness of the exit order, which the court concluded was justified. The other part of the hearing was effectively a *Daubert*

---

[1] The trooper later discovered a third unopened bottle of beer (this one also in one of defendant's jacket pockets), but this occurred after the trooper issued the exit order and is therefore irrelevant to our analysis of the propriety of the exit order.

hearing on the scientific validity of retrograde extrapolation — the process for determining defendant's BAC at the time of operation based on a test taken more than two hours later. The court concluded that "in this particular case, there is insufficient information in evidence regarding the Defendant's conduct during the period of time in question prior to the stop for an expert to make a valid retrograde extrapolation to the time of operation." The court held that "in the criminal context" it was not convinced of the accuracy and reliability of retrograde extrapolations, and the court therefore concluded that "the Datamaster test result is not admissible and is suppressed." See generally *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993) (delineating test for admissibility of expert testimony).

¶ 6. In the civil suspension hearing, on the other hand, the court relied on retrograde analysis of the Datamaster test results.[2] The court held that, although defendant's test results were obtained outside of the two-hour statutory window, they could be related back to the two-hour window to trigger a statutory presumption that defendant's BAC was 0.08 or higher at the time of operation. Finding this presumption unrebutted, the court ruled in favor of the State in the civil suspension hearing.

## I.

¶ 7. Defendant first argues that the trooper did not have a reasonable suspicion of DUI at the time he ordered defendant to exit his vehicle.[3] The trial court held that the trooper's exit order was justified. We agree with the trial court that the trooper's exit order did not violate defendant's constitutional rights.

¶ 8. Although the United States Supreme Court has interpreted the Fourth Amendment to the United States Constitution as allowing exit orders in automobile stops as a

---

[2] It was not improper for the trial court to find that evidence was inadmissible in a criminal proceeding but admissible in the civil suspension hearing. See V.R.C.P. 80.5(f)(3) (noting that in civil suspension hearings "[e]vidence is admissible if it is of a type commonly relied upon by reasonably prudent persons in the conduct of their affairs, and the Vermont Rules of Evidence are inapplicable except for the rules respecting privilege").

[3] Defendant does not contest on appeal whether the initial stop was justified or whether the police officer had probable cause to arrest defendant once defendant failed several of the field sobriety tests.

matter of course, *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977), we have held that Article 11 of the Vermont Constitution requires particular justification for an exit order, *State v. Sprague*, 2003 VT 20, ¶¶ 13-20, 175 Vt. 123, 824 A.2d 539 (rejecting the *Mimms* analysis). In *Sprague*, we noted that "the test to determine whether an exit order was justified under Article 11 is whether the objective facts and circumstances would support a reasonable suspicion that the safety of the officer, or of others, was at risk or that a crime has been committed." *Id.* ¶ 16. Thus, here the question is whether the objective facts and circumstances supported a reasonable, articulable suspicion of DUI.[4]

 ¶ 9. Here, the trooper based his exit order on defendant's "bad judgment with speeding in a snowstorm, [being] slow to respond and pull over . . . , odor of alcohol, [and] watery eyes," combined with defendant's admissions that "he had been drinking" and "had come from a party." Two recent cases from this Court make clear that the officer's exit order was justified here: regardless of whether speeding in a snowstorm or being slow to pull over can properly be considered factors in the analysis, or whether the trooper could also properly consider the unopened bottles of beer in places such as defendant's jacket pocket and the center console, the factors of an odor of alcohol, defendant's admission to drinking, and the appearance of watery eyes are sufficient indicia of DUI to validate an exit order. See *State v. Mara*, 2009 VT 96A, ¶ 12, 186 Vt. 389, 987 A.2d 939 (holding that "the odor of alcohol, admission to drinking, and watery and bloodshot eyes" were enough to create reasonable suspicion of DUI to allow the trooper to administer a PBT); *Santimore*, 2009 VT 104, ¶ 11 (reaching same conclusion based on these same factors). Although defendant argues that his admission to drinking was only an admission to having had one beer, we noted in *Mara* that "a driver's mere assertion that he has not drunk to excess

---

[4] We have held that the reasonable-suspicion threshold necessary for an exit order is equivalent to the threshold of suspicion required to administer a PBT under 23 V.S.A. § 1203(f). *State v. Santimore*, 2009 VT 104, ¶ 9, 186 Vt. 638, 987 A.2d 332 (mem.) (explaining that "reason to believe" that a person "may be" driving under the influence does not require incontrovertible proof of the underlying offense, only some basis for believing that a suspect may be driving under the influence). In other words, we will uphold the officer's action if the officer can point to reasonable, articulable facts supporting the belief that criminal behavior was afoot. *State v. McGuigan*, 2008 VT 111, ¶ 14 n.1, 184 Vt. 441, 965 A.2d 511.

need not be accepted at face value by an officer who observes other indicia of impairment." 2009 VT 96A, ¶ 9. Indeed, in *Mara*, the defendant admitted only to having had two beers, and the defendant in *Santimore* admitted only to having had one beer, and we held that the exit orders were justified in both of those cases.

## II.

¶ 10. We next address the State's cross-appeal to determine whether the trial court abused its discretion in granting defendant's motion to suppress the results of the Datamaster breathalyzer test. Here, because the trial court improperly engaged in weighing the evidence, rather than limiting its analysis to a determination of the admissibility of the evidence, and because retrograde extrapolation is legitimate science, we hold that the trial court abused its discretion by suppressing this evidence. See *985 Assocs., Ltd. v. Daewoo Elecs. Am., Inc.*, 2008 VT 14, ¶ 10, 183 Vt. 208, 945 A.2d 381 ("Given the general approach of the rules of evidence of relaxing the traditional barriers to 'opinion' testimony, the trial court's inquiry into expert testimony should primarily focus on excluding 'junk science' — because of its potential to confuse or mislead the trier of fact — rather than serving as a preliminary inquiry into the merits of the case." (quotations and citations omitted)).

¶ 11. We have previously held that reviewing for abuse of discretion does not prevent us from "engag[ing] in a substantial and thorough analysis of the trial court's decision and order to ensure that the trial judge's decision was in accordance with *Daubert* and our applicable precedents." *USGen New Eng., Inc. v. Town of Rockingham*, 2004 VT 90, ¶ 24, 177 Vt. 193, 862 A.2d 269 (quotation omitted).

¶ 12. This Court has on several occasions "emphasize[d] . . . that *Daubert* presents an admissibility standard only." *Id.* ¶ 19. The *Daubert* Court itself noted that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596. This Court has similarly stated that "to tease out deficiencies of expert testimony, opponents should attack testimony of this nature through the adversarial process," rather than through excluding the evidence altogether. *In re JAM Golf, LLC*, 2008 VT 110, ¶ 9,

185 Vt. 201, 969 A.2d 47. Along these same lines, we have noted on several occasions that we adopted *Daubert* because it allowed a more liberal standard for admitting evidence. *State v. Tester*, 2009 VT 3, ¶ 18, 185 Vt. 241, 968 A.2d 895; *Daewoo*, 2008 VT 14, ¶ 9.

■■ ¶ 13. Here, we recognize that the trial court had good reasons for questioning the validity of the State's retrograde extrapolation analysis. In particular, the court was concerned that the State simply did not have enough information to make an accurate analysis. We conclude, however, that the court's concerns relate to the proper weight to be afforded the evidence, not whether the evidence is admissible in the first place. See, e.g., *Daewoo*, 2008 VT 14, ¶ 16 (holding that as long as scientific evidence "has a sound factual and methodological basis and is relevant to the issues at hand, it is within the purview of the trier of fact to assess its credibility and determine the weight to be assigned to it").

■ ¶ 14. The State argues, and we agree, that Vermont courts have accepted evidence regarding retrograde extrapolation for a number of decades. Indeed, in Vermont, we have to accept such evidence in the criminal context because " 'relation back' testimony is *necessary* to establish the defendant's blood alcohol content at the time of actual operation." *State v. Dumont*, 146 Vt. 252, 254, 499 A.2d 787, 789 (1985) (emphasis added). By contrast, in a number of other states, retrograde extrapolation is not required. See, e.g., *Commonwealth v. Wirth*, 936 S.W.2d 78, 83 (Ky. 1996) (noting that "in most cases the delay will favor the defendant by producing a lower reading" and holding that retrograde extrapolation is not required); *Commonwealth v. Colturi*, 864 N.E.2d 498, 503-04 (Mass. 2007) (holding that "[e]xpert testimony on retrograde extrapolation is not a prerequisite to the admissibility of breathalyzer results," provided that the test was conducted "within a reasonable time of the operation of [the] motor vehicle" and that "the passage of up to three hours between testing and operation is a reasonable time for this purpose"). Thus, retrograde extrapolation in general cannot be excluded under *Daubert*.

¶ 15. Although retrograde extrapolation is generally considered to meet the admissibility requirements of *Daubert*, defendant argues that we should nevertheless exclude such evidence here. According to defendant, the testimony from the State's expert is

unreliable because it fails to take into consideration a number of important factors, such as the amount of food defendant ate and his drinking pattern before operation. The trial court agreed and noted that "[i]nformation critical to this calculation would include the amount and time of food, if any, consumed at or near the period of time the Defendant consumed alcohol and it must be known when the Defendant commenced drinking and stopped drinking and the total number and type of drinks consumed." Though the court was correct that this information would undoubtedly make for a more accurate analysis, that is an issue that goes to the weight of the evidence, and the court went too far in holding that the test results here were unreliable as a matter of law. See, e.g., *People v. Wager*, 594 N.W.2d 487, 491 (Mich. 1999) (admitting BAC test results that were taken more than two hours after operation and holding that "[t]o the extent that the passage of time reduces the probative value of the test, the diminution goes to weight, not admissibility, and is for the parties to argue before the finder of fact").

¶ 16. As the Kentucky Supreme Court noted in *Wirth*, many of the facts needed to make retrograde extrapolation as accurate as possible, including the food and drinking patterns that the trial court held to be "critical" here, are facts that are "known only to the defendant." 936 S.W.2d at 84. Thus, if we were to affirm the trial court's ruling here, the practical effect would be to create a bright-line rule that would exclude the relation-back of breathalyzer test results anytime a defendant withheld information that only he knew regarding his eating and drinking patterns. In those situations, the trial court's ruling that information on food and drinking patterns is "critical," taken to its logical conclusion, would even exclude test results taken shortly after operation that revealed a BAC that was many times higher than the legal limit — results that all but guarantee that the defendant was intoxicated at the time of operation, regardless of his eating and drinking patterns. Such a rule is untenable and cannot be reconciled with the limited analysis required under *Daubert* for determining the admissibility of evidence.

¶ 17. In summary, the trial court specifically weighed one expert against another, rather than engaging in a more limited *Daubert* analysis. Though defendant is free to argue to the jury that it should not rely on a retrograde extrapolation that failed to take these factors into account, this is a classic battle of the experts

that should be played out for the finder of fact, not excluded as a matter of law pretrial. See, e.g., *Wager*, 594 N.W.2d at 491. For these reasons, the trial court erred in excluding the Datamaster breathalyzer test results.

## III.

¶ 18. Finally, we turn to the trial court's ruling on the merits against defendant in the civil suspension hearing. Although the court anchored its ruling in the statutory presumption listed in 23 V.S.A. § 1205(n), we need not address whether that presumption applies here because we find that the court's decision can be upheld without resort to § 1205(n).[5] See *Larkin v. City of Burlington*, 172 Vt. 566, 568, 772 A.2d 553, 556 (2001) (mem.) (this Court may affirm for any reason supported by the record).

¶ 19. Here, the trial court had ample support in the record for concluding that defendant's BAC was at or above 0.08. Defendant does not contest the validity of the test results, which revealed a BAC of between 0.117 and 0.126 just over two hours after operation. Although defendant's expert implied that these results could not be related back because defendant might have still been in the absorption phase at the time of testing, these conclusions were entirely hypothetical and based on the theory, unsupported by any evidence in this case, that defendant drank large quantities of alcohol immediately before operating his vehicle. See *State v. Gray*, 150 Vt. 184, 186-87 & n.1, 552 A.2d 1190, 1192 & n.1 (1988) (rejecting a similar " 'chug-a-lug' theory" because the evidence did not support it). Defendant did not personally testify or present any witnesses who could attest to

---

[5] Section 1205(n) states that

> if there was at any time within two hours of operating, attempting to operate or being in actual physical control of a vehicle an alcohol concentration of 0.08 or more, it shall be a rebuttable presumption that the person's alcohol concentration was 0.08 or more at the time of operating, attempting to operate or being in actual physical control.

Defendant argues that the trial court committed legal error by invoking this presumption here when it is uncontested that the Datamaster test was taken more than two hours after operation. The trial court reasoned that the statutory presumption was triggered because it was "virtually certain" that anyone with a BAC of between 0.117 and 0.126 roughly two hours and ten minutes after operating a vehicle had a BAC of at least 0.08 ten minutes earlier "at the end of the two-hour window."

defendant's eating and drinking patterns leading up to operation of the vehicle. The theory of defendant's expert was therefore purely speculative. Indeed, the only evidence in the record on this point directly contradicted any "chug-a-lug" theory because the trooper testified that defendant told him that he had drunk only "one beer" shortly before driving. Defendant therefore failed to rebut the testimony of the State's expert that, if anything, defendant's BAC at the time of operation was significantly *higher* than the BAC levels recorded more than two hours later when he took the Datamaster breathalyzer test. See *Wirth*, 936 S.W.2d at 83 (recognizing that in most cases any delay in testing aids defendant by lowering the BAC reading). Thus, given that the Datamaster breathalyzer test results were well above the legal limit of 0.08, combined with expert testimony from the State that defendant's BAC was higher at the time of operation, and absent any evidentiary basis to believe that defendant's BAC could have been lower at the time of operation, the trial court was correct to rule against defendant in the civil suspension hearing.

*The trial court's ruling in the civil suspension hearing is affirmed; the court's ruling in the criminal matter is reversed and remanded for proceedings consistent with this decision.*