2010 VT 64



State v. Burgess (2009-103 &
2009-104)

 

2010 VT 64

 

[Filed 02-July-2010]

 

NOTICE:  This opinion is
subject to motions for reargument under V.R.A.P. 40 as well as formal revision
before publication in the Vermont Reports.  Readers are requested to
notify the Reporter of Decisions, Vermont Supreme Court, 109 State Street,
Montpelier, Vermont 05609-0801 of any errors in order that corrections may be
made before this opinion goes to press.

 

 


 2010 VT 64 
 
  


 Nos. 2009-103 & 2009-104
 
  


 State of Vermont
 
 
 Supreme Court
 
 
  
 
 
  
 
 
  
 
 
 On Appeal from
 
 
      v.
 
 
 District Court of Vermont,
 
 
  
 
 
 Unit No. 2, Chittenden Circuit
 
 
  
 
 
  
 
 
 Kent W. Burgess
 
 
 March Term, 2010
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 A.
 Gregory Rainville, J.
 
 
  
 
 Stuart G. Schurr, Department of State’s Attorneys,
Montpelier, for  

  Plaintiff-Appellee/Cross-Appellant.

 

Paul S. Volk of Blodgett, Watts, Volk & Sawyer, P.C.,
Burlington, for 

  Defendant-Appellant/Cross-Appellee.

 

 

PRESENT:  Reiber, C.J., Dooley, Johnson, Skoglund and
Burgess, JJ.

 

 

¶ 1.            
REIBER, C.J.   This appeal and cross-appeal stem from
consolidated civil suspension and criminal proceedings against defendant for
driving under the influence (DUI).  Defendant appeals the trial court’s
final ruling against him in the civil suspension case, and the State appeals
the court’s interlocutory ruling suppressing the Datamaster breathalyzer test
results in the criminal case.  Defendant argues that the civil suspension
hearing should have been dismissed because: (1) the exit order was not
justified by a reasonable suspicion of DUI; and (2) the trial court
improperly applied a statutory presumption in reaching its ruling in the civil
suspension hearing.  The State contests these issues and, as
cross-appellant, argues that the trial court erred in excluding the Datamaster
breathalyzer test results from the criminal case.  We affirm the trial
court’s ruling on the civil suspension hearing and reverse the trial court’s
grant of defendant’s motion to suppress the Datamaster breathalyzer test
results in the criminal case.

¶ 2.            
At 1:51 a.m. on November 24, 2007, defendant was driving east on Vermont
Route 15 and passed a state trooper traveling in the opposite direction. 
The trooper clocked defendant going 65 in a 50-mile-per-hour zone.  The
trooper briefly flashed his blue lights, turned around, caught up with
defendant, and followed him for approximately half of a mile before turning his
blue lights back on and pulling over defendant.  The trooper did not
observe any erratic driving while he was following defendant.  The trooper
was, however, surprised that: (1) defendant did not stop when the trooper
first flashed his lights; and (2) when defendant did pull over, he did not
pull entirely off the road, but instead remained partially within the lane of
the road.  Defendant argues that he did not know the trooper was pulling
him over at first and that his failure to pull entirely off the road is
explained by the fact that snowfall had covered the lines of the road and that
the shoulder of that section of road was particularly narrow.

¶ 3.            
After approaching defendant’s vehicle, the trooper observed a “moderate odor
of alcohol” coming from “within the truck.”  He could not say whether the
alcohol came from defendant, although defendant was the only person in the
truck at the time.  The trooper noticed that defendant’s eyes were watery,
but they were not bloodshot.  The trooper also noticed that there were two
unopened bottles of beer in the vehicle, one in the console and one visibly
protruding from the pocket of the jacket that defendant was wearing.[1] 
In response to questioning from the trooper, defendant stated that he was
coming from a party and admitted that he had consumed one drink “20 minutes
ago.”  

¶ 4.            
Suspecting that defendant was intoxicated, the trooper ordered defendant
to pull into a nearby driveway and exit his vehicle.  The trooper then
conducted field sobriety tests.  Defendant failed several of those
tests.  The trooper asked defendant to submit to a preliminary breath test
(PBT), and defendant stated that he did not know whether he should take
it.  When defendant finally agreed to submit to a PBT, the trooper refused
to allow the test and arrested defendant because, according to the trooper, he
already “had enough clues to ask for an evidentiary test at that point.” 
After being arrested, defendant was brought to a police station and, roughly
two hours and eight minutes since last operating his vehicle, he was given a
Datamaster breathalyzer test, indicating a blood alcohol content (BAC) of 0.126
at 3:59 a.m. and 0.117 at 4:02 a.m.  The State has stipulated that
these test results were “generated outside two hours from the time of
operation.”  

¶ 5.            
In the proceedings before the trial court, defendant filed motions to
suppress and dismiss.  The court held a hearing, which involved two main
issues.  One part of the hearing addressed the appropriateness of the exit
order, which the court concluded was justified.  The other part of the
hearing was effectively a Daubert hearing on the scientific validity of
retrograde extrapolation—the process for determining defendant’s BAC at the
time of operation based on a test taken more than two hours later.  The
court concluded that “in this particular case, there is insufficient
information in evidence regarding the Defendant’s conduct during the period of
time in question prior to the stop for an expert to make a valid retrograde
extrapolation to the time of operation.”  The court held that “in the
criminal context,” it was not convinced of the accuracy and reliability of
retrograde extrapolations, and the court therefore concluded that “the
Datamaster test result is not admissible and is suppressed.”  See
generally Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993)
(delineating test for admissibility of expert testimony).

¶ 6.            
In the civil suspension hearing, on the other hand, the court relied on
retrograde analysis of the Datamaster test results.[2] 
The court held that, although defendant’s test results were obtained outside of
the two-hour statutory window, they could be related back to the two-hour
window to trigger a statutory presumption that defendant’s BAC was 0.08 or
higher at the time of operation.  Finding this presumption unrebutted, the
court ruled in favor of the State in the civil suspension hearing.

I.

¶ 7.            
Defendant first argues that the trooper did not have a reasonable
suspicion of DUI at the time he ordered defendant to exit his vehicle.[3]  The trial court held that the
trooper’s exit order was justified.  We agree with the trial court that
the trooper’s exit order did not violate defendant’s constitutional rights.

¶ 8.            
Although the United States Supreme Court has interpreted the Fourth
Amendment to the United States Constitution as allowing exit orders in
automobile stops as a matter of course, Pennsylvania v. Mimms, 434 U.S.
106, 111 (1977), we have held that Article 11 of the Vermont Constitution
requires particular justification for an exit order, State v. Sprague,
2003 VT 20, ¶¶ 13-20, 175 Vt. 123, 824 A.2d 539 (rejecting the Mimms
analysis).  In Sprague, we noted that “the test to determine
whether an exit order was justified under Article 11 is whether the objective
facts and circumstances would support a reasonable suspicion that the safety of
the officer, or of others, was at risk or that a crime has been
committed.”  Id. ¶ 16.  Thus, here the question is
whether the objective facts and circumstances supported a reasonable,
articulable suspicion of DUI.[4]  

¶ 9.            
Here, the trooper based his exit order on defendant’s “bad judgment with
speeding in a snowstorm, [being] slow to respond and pull
over . . . , odor of alcohol, [and] watery eyes,” combined with
defendant’s admissions that “he had been drinking” and “had come from a
party.”  Two recent cases from this Court make clear that the officer’s
exit order was justified here: regardless of whether speeding in a snowstorm or
being slow to pull over can properly be considered factors in the analysis, or
whether the trooper could also properly consider the unopened bottles of beer
in places such as defendant’s jacket pocket and the center console, the factors
of an odor of alcohol, defendant’s admission to drinking, and the appearance of
watery eyes are sufficient indicia of DUI to validate an exit order.  See State
v. Mara, 2009 VT 96A, ¶ 12, ___ Vt. ___, 987 A.2d 939 (holding that
“the odor of alcohol, admission to drinking, and watery and bloodshot eyes”
were enough to create reasonable suspicion of DUI to allow the trooper to
administer a PBT); Santimore, 2009 VT 104, ¶ 11 (reaching same
conclusion based on these same factors).  Although defendant argues that
his admission to drinking was only an admission to having had one beer, we
noted in Mara that “a driver’s mere assertion that he has not drunk to
excess need not be accepted at face value by an officer who observes other
indicia of impairment.”  2009 VT 96A, ¶ 9.  Indeed, in Mara,
the defendant admitted only to having had two beers, and the defendant in Santimore
admitted only to having had one beer, and we held that the exit orders were
justified in both of those cases.    

II.

¶ 10.        
We next address the State’s cross-appeal to determine whether the trial
court abused its discretion in granting defendant’s motion to suppress the
results of the Datamaster breathalyzer test.  Here, because the trial
court improperly engaged in weighing the evidence, rather than limiting its
analysis to a determination of the admissibility of the evidence, and because
retrograde extrapolation is legitimate science, we hold that the trial court
abused its discretion by suppressing this evidence.  See 985 Assocs.,
Ltd. v. Daewoo Elecs. Am., Inc., 2008 VT 14, ¶ 10, 183 Vt. 208, 945 A.2d
381 (“Given the general approach of the rules of evidence of relaxing the
traditional barriers to ‘opinion’ testimony, the trial court’s inquiry into
expert testimony should primarily focus on excluding ‘junk science’—because of
its potential to confuse or mislead the trier of fact—rather than serving as a
preliminary inquiry into the merits of the case.” (quotations and citations
omitted)).

¶ 11.        
We have previously held that reviewing for abuse of discretion does not
prevent us from “engag[ing] in a substantial and thorough analysis of the trial
court’s decision and order to ensure that the trial judge’s decision was in
accordance with Daubert and our applicable precedents.”  USGen
New Eng., Inc. v. Town of Rockingham, 2004 VT 90, ¶ 24, 177 Vt. 193, 862
A.2d 269 (quotation omitted).

¶ 12.        
This Court has on several occasions
“emphasize[d] . . . that Daubert presents an
admissibility standard only.”  Id. ¶ 19.  The Daubert
Court itself noted that “[v]igorous cross-examination, presentation of contrary
evidence, and careful instruction on the burden of proof are the traditional
and appropriate means of attacking shaky but admissible evidence.”  509
U.S. at 596.  This Court has similarly stated that “to tease out deficiencies
of expert testimony, opponents should attack testimony of this nature through
the adversarial process,” rather than through excluding the evidence
altogether.  In re JAM Golf, LLC, 2008 VT 110, ¶ 9, 185 Vt. 201,
969 A.2d 47.  Along these same lines, we have noted on several occasions
that we adopted Daubert because it allowed a more liberal standard for
admitting evidence.  State v. Tester, 2009 VT 3, ¶ 18, 185 Vt. 241,
968 A.2d 895; Daewoo, 2008 VT 14, ¶ 9.

¶ 13.        
Here, we recognize that the trial court had good reasons for questioning
the validity of the State’s retrograde extrapolation analysis.  In
particular, the court was concerned that the State simply did not have enough
information to make an accurate analysis.  We conclude, however, that the
court’s concerns relate to the proper weight to be afforded the evidence, not
whether the evidence is admissible in the first place.  See, e.g., Daewoo,
2008 VT 14, ¶ 16 (holding that as long as scientific evidence “has a sound
factual and methodological basis and is relevant to the issues at hand, it is
within the purview of the trier of fact to assess its credibility and determine
the weight to be assigned to it”).

¶ 14.        
The State argues, and we agree, that Vermont courts have accepted
evidence regarding retrograde extrapolation for a number of decades. 
Indeed, in Vermont, we have to accept such evidence in the criminal context
because “ ‘relation back’ testimony is necessary to establish the
defendant’s blood alcohol content at the time of actual operation.”  State
v. Dumont, 146 Vt. 252, 254, 499 A.2d 787, 789 (1985) (emphasis
added).  By contrast, in a number of other states, retrograde
extrapolation is not required.  See, e.g., Commonwealth v. Wirth,
936 S.W.2d 78, 83 (Ky. 1996) (noting that “in most cases the delay will favor
the defendant by producing a lower reading” and holding that retrograde
extrapolation is not required); Commonwealth v. Colturi, 864 N.E.2d 498,
503-04 (Mass. 2007) (holding that “[e]xpert testimony on retrograde extrapolation
is not a prerequisite to the admissibility of breathalyzer results,” provided
that the test was conducted “within a reasonable time of the operation of [the]
motor vehicle” and that “the passage of up to three hours between testing and
operation is a reasonable time for this purpose”).  Thus, retrograde
extrapolation in general cannot be excluded under Daubert.  

¶ 15.        
Although retrograde extrapolation is generally considered to meet the
admissibility requirements of Daubert, defendant argues that we should
nevertheless exclude such evidence here.  According to defendant, the
testimony from the State’s expert is unreliable because it fails to take into
consideration a number of important factors, such as the amount of food
defendant ate and his drinking pattern before operation.  The trial court
agreed and noted that “[i]nformation critical to this calculation would include
the amount and time of food, if any, consumed at or near the period of time the
Defendant consumed alcohol and it must be known when the Defendant commenced
drinking and stopped drinking and the total number and type of drinks
consumed.”  Though the court was correct that this information would
undoubtedly make for a more accurate analysis, that is an issue that goes to
the weight of the evidence, and the court went too far in holding that the test
results here were unreliable as a matter of law.  See, e.g., People v.
Wager, 594 N.W.2d 487, 491 (Mich. 1999) (admitting BAC test results that
were taken more than two hours after operation and holding that “[t]o the
extent that the passage of time reduces the probative value of the test, the
diminution goes to weight, not admissibility, and is for the parties to argue
before the finder of fact”).

¶ 16.        
As the Kentucky Supreme Court noted in Wirth, many of the facts
needed to make retrograde extrapolation as accurate as possible, including the
food and drinking patterns that the trial court held to be “critical” here, are
facts that are “known only to the defendant.”  936 S.W.2d at 84. 
Thus, if we were to affirm the trial court’s ruling here, the practical effect
would be to create a bright-line rule that would exclude the relation-back of
breathalyzer test results anytime a defendant withheld information that only he
knew regarding his eating and drinking patterns.  In those situations, the
trial court’s ruling that information on food and drinking patterns is
“critical,” taken to its logical conclusion, would even exclude test results
taken shortly after operation that revealed a BAC that was many times higher
than the legal limit—results that all but guarantee that the defendant was
intoxicated at the time of operation, regardless of his eating and drinking
patterns.  Such a rule is untenable and cannot be reconciled with the
limited analysis required under Daubert for determining the
admissibility of evidence.  

¶ 17.        
In summary, the trial court specifically weighed one expert against
another, rather than engaging in a more limited Daubert analysis. 
Though defendant is free to argue to the jury that it should not rely on a
retrograde extrapolation that failed to take these factors into account, this
is a classic battle of the experts that should be played out for the finder of
fact, not excluded as a matter of law pretrial.  See, e.g., Wager,
594 N.W.2d at 491.  For these reasons, the trial court erred in excluding
the Datamaster breathalyzer test results.

III.

¶ 18.        
Finally, we turn to the trial court’s ruling on the merits against defendant
in the civil suspension hearing.  Although the court anchored its ruling
in the statutory presumption listed in 23 V.S.A. § 1205(n), we need not
address whether that presumption applies here because we find that the court’s
decision can be upheld without resort to § 1205(n).[5]  See Larkin v. City of Burlington,
172 Vt. 566, 568, 772 A.2d 553, 556 (2001) (mem.) (this Court may affirm for
any reason supported by the record).

¶ 19.        
Here, the trial court had ample support in the record for concluding
that defendant’s BAC was at or above 0.08.  Defendant does not contest the
validity of the test results, which revealed a BAC of between 0.117 and 0.126
just over two hours after operation.  Although defendant’s expert implied
that these results could not be related back because defendant might have still
been in the absorption phase at the time of testing, these conclusions were
entirely hypothetical and based on the theory, unsupported by any evidence in
this case, that defendant drank large quantities of alcohol immediately before
operating his vehicle.  See State v. Gray, 150 Vt. 184, 186-87
& n.1, 552 A.2d 1190, 1192 & n.1 (1988) (rejecting a similar “
‘chug-a-lug’ theory” because the evidence did not support it).  Defendant
did not personally testify or present any witnesses who could attest to
defendant’s eating and drinking patterns leading up to operation of the
vehicle.  The theory of defendant’s expert was therefore purely
speculative.  Indeed, the only evidence in the record on this point
directly contradicted any “chug-a-lug” theory because the trooper testified
that defendant told him that he had drunk only “one beer” shortly before
driving.  Defendant therefore failed to rebut the testimony of the State’s
expert that, if anything, defendant’s BAC at the time of operation was
significantly higher than the BAC levels recorded more than two hours
later when he took the Datamaster breathalyzer test.  See Wirth,
936 S.W.2d at 83 (recognizing that in most cases any delay in testing aids
defendant by lowering the BAC reading).  Thus, given that the Datamaster
breathalyzer test results were well above the legal limit of 0.08, combined
with expert testimony from the State that defendant’s BAC was higher at the time
of operation, and absent any evidentiary basis to believe that defendant’s BAC
could have been lower at the time of operation, the trial court was correct to
rule against defendant in the civil suspension hearing.  

The trial
court’s ruling in the civil suspension hearing is affirmed; the court’s ruling
in the criminal matter is reversed and remanded for proceedings consistent with
this decision.

 

 


  
 
 
  
 
 
 FOR THE COURT:
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 Chief
 Justice
 
  











[1] 
The trooper later discovered a third unopened bottle of beer (this one also in
one of defendant’s jacket pockets), but this occurred after the trooper issued
the exit order and is therefore irrelevant to our analysis of the propriety of
the exit order.





[2] 
It was not improper for the trial court to find that evidence was inadmissible
in a criminal proceeding but admissible in the civil suspension hearing. 
See V.R.C.P. 81.5 (noting that in civil suspension hearings “[e]vidence is
admissible if it is of a type commonly relied upon by reasonably prudent
persons in the conduct of their affairs, and the Vermont Rules of Evidence are
inapplicable except for the rules respecting privilege”).

 





[3] 
Defendant does not contest on appeal whether the initial stop was justified or
whether the police officer had probable cause to arrest defendant once
defendant failed several of the field sobriety tests.  

 





[4] 
We have held that the reasonable-suspicion threshold necessary for an exit
order is equivalent to the threshold of suspicion required to administer a PBT
under 13 V.S.A. § 1203(f).  State v. Santimore, 2009 VT 104,
¶ 9 ___ Vt. ___, 987 A.2d 332 (mem.) (explaining that “reason to believe”
that a person “may be” driving under the influence does not require
incontrovertible proof of the underlying offense, only some basis for believing
that a suspect may be driving under the influence).  In other words, we
will uphold the officer’s action if the officer can point to reasonable,
articulable facts supporting the belief that criminal behavior was afoot. 
State v. McGuigan, 2008 VT 111, ¶ 14 n.1, 184 Vt. 441, 965 A.2d 511. 






[5] 
Section 1205(n) states that 

 

if
there was at any time within two hours of operating, attempting to operate or
being in actual physical control of a vehicle an alcohol concentration of 0.08
or more, it shall be a rebuttable presumption that the person’s alcohol
concentration was 0.08 or more at the time of operating, attempting to operate
or being in actual physical control.

 

Defendant argues that the
trial court committed legal error by invoking this presumption here when it is
uncontested that the Datamaster test was taken more than two hours after
operation.  The trial court reasoned that the statutory presumption was
triggered because it was “virtually certain” that anyone with a BAC of between
0.117 and 0.126 roughly two hours and ten minutes after operating a vehicle had
a BAC of at least 0.08 ten minutes earlier “at the end of the two-hour
window.”