STATE OF VERMONT

SUPERIOR COURT                              ENVIRONMENTAL DIVISION

|   |   |
|---|---|
| | } |
| In re Gilmore LLC 5-lot Subdivision | } |
| Conditional Use Application | }     Docket No. 131-8-10 Vtec |
| (Appeal of McGee) | } |
| (Cross-Appeal of Gilmore, LLC) | } |
| | } |

Decision and Order

Appellants Jerry and Beverly McGee appealed from a decision of the Planning Commission of the Town of Plymouth, Vermont granting conditional use approval to Applicant Gilmore LLC for a five-lot residential subdivision. Appellee-Applicant Gilmore LLC also filed a cross-appeal contesting whether any section of the zoning ordinance or town plan relied upon by Appellants is sufficiently specific to be enforceable.

Jerry and Beverly McGee are represented by C. Daniel Hershenson, Esq., Amy C. Ashworth, Esq., and Nathan H. Stearns, Esq.; Gilmore LLC is represented by Lawrence G. Slason, Esq.; and the Town of Plymouth is represented by Frederick M. Glover, Esq. In addition, Interested Persons Holly Ellis, Tom Ellis, and Randall Shimp have entered appearances and represent themselves.; they participated fully in the trial and in pre-trial telephone conferences, but did not file memoranda in this matter.

An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge. A site visit was taken at the end of the first day of hearing, with the parties and their representatives. The parties were given the opportunity to submit written memoranda and requests for findings. Upon consideration of the evidence as illustrated by the site visit, and of the written memoranda and requests

1

for findings filed by the parties, the Court finds and concludes as follows.

Procedural History

Gilmore LLC (Applicant) filed an application seeking conditional use approval for the creation of a five-lot residential subdivision easterly of Gilmore Road. The Town of Plymouth does not have subdivision regulations, but defines a subdivision as requiring conditional use approval under § 4.16 of the 2007 Plymouth Zoning Ordinance (Zoning Ordinance).[1] The Planning Commission denied that application on July 1, 2008. Applicant appealed the decision to this Court, which remanded it pursuant to a stipulation between the parties to allow Applicant to file an amended application. The amended application was filed on May 13, 2010 and approved by the Planning Commission on July 6, 2010, with conditions that Applicant now proposes to incorporate into its application. Neighbors Jerry and Beverly McGee (Appellants) appealed; Applicant cross-appealed.

Factual Findings

Applicant seeks approval of a five-lot residential subdivision of a 93.43 acre forested parcel of land with access to the end of Dix Hill Road in the Rural Densities[2] Five-Acre zoning district of the Town of Plymouth. Dix Hill Road is a Class 3 town highway (Town Highway #63) which extends northwesterly from existing public roads uphill to the project property through an unrelated 26-lot existing residential subdivision, the Dix Hill subdivision.

---

[1] In re Gilmore Road, LLC Conditional Use Application, No. 194-9-08 Vtec, slip op. at 13–14 (Vt. Envtl. Ct. Sept. 10, 2009) (Wright, J.) (describing the Town of Plymouth's regulation of subdivisions as a conditional use).

[2] The Zoning Ordinance uses the plural term "Densities" throughout, even in referencing a single zoning district; this decision follows the usage of the Zoning Ordinance.

Appellants own a 12.57-acre roughly triangular parcel of land (the McGee Parcel), numbered as Lot #20 (tax parcel # 100 as shown on Ex. J) in the Dix Hill subdivision, with access at the southeast point of the triangle to the hammerhead turnaround at the end of Dix Hill Road. A short driveway and parking area leads from the end of Dix Hill Road to the location of Appellants' house. The McGee Parcel's northwesterly boundary adjoins the portion of Lot 5 of Applicant's project property that is not proposed for development in the present application. The northwestern corner of the westerly portion of Applicant's project property adjoins the southeastern corner of the property of Interested Person Shimp.

In addition to the 93.43-acre project property, Applicant owns[3] a 50-foot-wide strip of land shown as tax parcel # 101 on Ex. J, running along the McGee Parcel's easterly boundary between the McGee Parcel and the next lot in the Dix Hill subdivision, tax parcel # 102. The 50-foot-wide strip of land connects the end of Dix Hill Road to an unimproved trail sometimes referred to as Gilmore Road, which extends in a northerly direction through Applicant's project property, and through an unrelated property to the north, to connect with Kingdom Road.[4]

All of the development proposed in the present application lies easterly of the so-called Gilmore Road. That is, although Applicant's representatives stated at trial that it reserves the right to make a future application for development of the approximately 52-acre portion of Lot 5 lying to the west of Gilmore Road, which contains some areas identified as riparian buffer zones and Class 3 wetlands on Ex. H2, no such development is proposed in the present application.

---

[3] Any litigation over the ownership of this one-acre strip of land is in the jurisdiction of the Civil Division of the Superior Court, not the Environmental Division.

[4] An earlier subdivision proposal for the project property, denied by the Planning Commission, had proposed access from Kingdom Road by way of improvements to Gilmore Road; the present application incorporates a condition precluding access from Kingdom Road.

Each of the proposed lots contains more than the minimum five acres in area required by § 2.8 of the Zoning Ordinance for the Rural Densities Five-Acre zoning district. As shown on Ex. H2, Lot 1 contains 6.59 acres, Lot 2 contains 5.06 acres, Lot 3 contains 5.74 acres, Lot 4 contains 6.01 acres, and Lot 5 contains the remaining 70.03 acres, of which approximately 18 acres lies easterly of Gilmore Road. The property of Interested Persons Ellis adjoins the project property to the east of Lot 3.

Each lot is proposed to contain a single-family house and to be served by an individual drilled well. All five lots are proposed to be served by individual septic tanks and wastewater pretreatment systems, and by a community mound-type wastewater system to be located on Lot 4. Limited areas of vista clearing are proposed for Lots 1, 4, and 5; no vista clearing is allowed on Lots 2 or 3.

Applicant has incorporated into its present application, and proposes to comply with, all six conditions imposed on it by the Planning Commission in the approval on appeal. All six conditions are contained in full in Ex. FF. The subdivision plat Applicant was required to produce by the sixth condition (a plat combining into Lot 5 the lands lying on both sides of Gilmore Road) has been prepared by Applicant and is the basis for the subdivision plans in evidence in this appeal. The first five conditions impose the following requirements:

1. Clearing limits "shall be adjusted per conditions, reducing the area for vista clearing from 3 acres to 1½ acres for the total five lots" as shown on Ex. H5, with no clearing to occur on slopes greater than 25%.

2. Applicant shall comply with the requirements of § 3.15 of the Zoning Ordinance as to outdoor lighting (quoted in full in Ex. FF). Section 3.15 requires, among other things, that lighting be directed downwards and be shielded so that it does not shine into the night sky.

3. The subdivision shall have no access to or from Kingdom Road.

4. Applicant "will be required to obtain [a] driveway access permit."

4

5. The portion of Lot 5 that lies east of Gilmore Road, consisting of approximately 18 acres, "will have only one residential dwelling and cannot be further subdivided."

The project property contains areas of moderate and steep slopes, and areas of low to moderately erodible soils, typical of the Green Mountain area of Windsor County. The physical characteristics of the portion of the property lying to the east of Gilmore Road, that is, the area proposed for development in the present application, are suitable for residential development at a density of not more than one single-family house per five acres, as long as the sites on which the houses are constructed avoid the areas of steeper slopes (greater than 25%) that run through the property in a roughly north to south or southwest direction, as shown on Ex. H1.

Applicant proposes that not more than a total of 9.36 acres of land will be cleared, as shown on Ex. H5, including the 1.5 acres of vista clearing. Applicant proposes that not more than a total of 5.41 acres of soil will be disturbed for the project, consisting of 2.96 acres for construction of the access road and the water supply and wastewater disposal systems, and 2.45 acres for the individual driveways and house sites. Applicant obtained coverage under the state Construction General Permit 3-9020 for its stormwater discharge associated with its construction activity. Ex. L, "Authorization of Notice of Intent #6316-9020." Coverage under that general permit requires a risk analysis. The project's risk mitigation factors (that stormwater will pass through an established vegetated buffer, that not more than two acres of disturbed soils will be open at any time, and that any disturbed area will be stabilized within seven days) balance its risk factors that more than a total of two acres will be disturbed, and that more than an acre of the disturbed soil has a slope greater than 15%. However, since the original notice of intent only proposed stabilization within 14 days, Applicant must obtain amended coverage under the Construction General Permit 3-9020 reflecting the

5

seven-day-stabilization condition.

The project will also require a state operational stormwater discharge permit or coverage under the stormwater general permit (#3-9015) to address stormwater runoff from the houses, driveways, and other impervious areas once the project is completed, as the project will have an impervious area of greater than one acre. Nothing in the Zoning Ordinance appears to require this state permit to be obtained in advance of applying for municipal approval of a subdivision. It would be premature to obtain the operational stormwater permit before the impervious area resulting from the house designs is known. The project is capable of qualifying for a stormwater discharge permit by conveying rooftop drainage from each house to areas in which it can infiltrate into the soil, and is likely also to qualify for the so-called Environmentally Sensitive Rural Development Credit. If a stormwater detention pond is necessary, there is room on Lot 5 for the construction of such a pond.

Based on the state Wastewater System and Potable Water Supply permit WW-3-1778 issued for the project, Ex. K, each house is restricted to a maximum of four bedrooms with a design flow of 1575 gallons per day of wastewater. Each lot has a septic tank and biofilter effluent pretreatment system from which the wastewater flows to the community mound wastewater disposal system. The community mound wastewater disposal system is proposed to be located in an area on Lots 4 and 5 whose native soils have a slope of not more than 15%.

Access to and within the proposed subdivision is proposed to be by a 50-foot-wide permanent easement or right-of-way from the end of Dix Hill Road, through Lots 4 and 5 and ending at a cul-de-sac 75 feet in diameter on Lot 2. Applicant proposes to construct a common access roadway 2,150 feet in length within the right-of-way, and having a total width of 24 feet, consisting of a 20-foot-wide traveled way with 2-foot-wide shoulders on either side. Within the project property

6

the proposed roadway passes through areas of steep slope; however, it has been designed and engineered with appropriate cutting and filling and slope stabilization to avoid erosion of the areas of steep slope once the roadway has been constructed.

Another 50-foot-wide permanent right-of-way extends from the cul-de-sac through Lot 2 to its boundary with Lot 1, and a right-of-way wider than 50 feet extends from the cul-de-sac to the boundary of Lot 3. Individual driveways are proposed to extend from the access road to the house site on each lot. Each driveway is designed to have a 16-foot-wide traveled way and a sufficient apron with a 35-foot turning radius to enable a fire truck to turn into each driveway safely. The cul-de-sac serving lots 1, 2, and 3 is wide enough to allow a pumper fire truck to maneuver back and forth to negotiate the acute turn into the Lot 3 driveway, although the fire responders are expected to be able to reach the location of the Lot 3 house site by pumping water from a truck located in the cul-de-sac.

Applicant-Cross-Appellant's Statement of Questions

Applicant asks whether there are any legally enforceable standards, policies, or provisions of the 2005 Plymouth Town Plan (Town Plan) or the 2007 Plymouth Zoning Ordinance which prohibit Applicant's proposed subdivision, or, conversely, whether the provisions referenced in Appellants' Statement of Questions are sufficiently specific to be enforceable. This decision will address Applicant's issues in the context of each of the questions in Appellants' Statement of Questions.

### Required Frontage On, or Access to, Public Roads (§ 3.3) (Appellants' Question 2)

Appellants ask whether the proposed subdivision has the required access to a public road as required by § 3.3 of the Zoning Ordinance and 24 V.S.A. § 4412(3), and whether the required findings can be made under § 3.3.1–3.3.3. The proposed

7

subdivision has access to a public road, Dix Hill Road, by way of a 50-foot-wide strip of land owned by Applicant. The project meets § 3.3 and the state statute because the subdivision's Declaration of Restrictive Covenants and Easements provides that all of the lots have a "perpetual right-of-way and easement 50 feet in width" over the access road from the end of Dix Hill Road to the boundary of each lot. Ex. Z.

### Conditional Use Review (§ 4.16.2)

In the Rural Densities Five-Acre zoning district, subdivisions require conditional use approval under § 4.16. See § 2.8. The remainder of Appellants' Questions ask whether the proposed five-lot subdivision satisfies the following four criteria for conditional use approval.[5]

### Access for Fire Equipment and On-Site Pedestrian Safety (§ 4.16.2.b) (Appellants' Question 1(a))

Appellants ask whether the design of the proposed subdivision will result in an undue adverse effect on access for fire equipment and on-site pedestrian safety. The project's access road is designed to allow safe access for fire equipment, and it is wide enough and will be lightly-enough traveled, with only a total of 18 vehicle trips per day, to be safe for pedestrians. All five of the driveways are designed with a 35-foot turning radius at their apron adequate for the fire trucks used by the Plymouth volunteer fire department to negotiate the turn into each driveway, although the acute turn into the Lot 3 driveway from the cul-de-sac serving Lots 1, 2, and 3 may require back and forth maneuvering by the fire trucks in order to

---

[5] Although Appellants ask generally whether the proposed subdivision complies with the conditional use criteria, their Statement of Questions only raises issues specific to the four criteria addressed in this decision.

negotiate the turn. Applicant's engineer stated that the fire responders "probably wouldn't bring the truck above the cul-de-sac," suggesting that water from a truck at the location and elevation of the cul-de-sac could be pumped to the location of the Lot 3 house site.

Accordingly, the Court will impose an additional condition to ensure both that the fire equipment is capable of negotiating the turn into the Lot 3 driveway and that water from a truck at the location and elevation of the cul-de-sac can be pumped to the location of the Lot 3 house site. With the additional condition, the project design will not result in an undue adverse effect on access for fire equipment or on pedestrian safety on the project site.

### Traffic (§ 4.16.2.h) (Appellants' Question 1(d))

Appellants ask whether the proposed subdivision will result in an undue adverse effect on traffic on roads and highways in the vicinity of the project. Access to the project is by Dix Hill Road, a Class 3 town highway already maintained by the Town. The project would add only 18 vehicle trip ends per day to the traffic using Dix Hill Road, which will not have any adverse effect on traffic on that roadway or on the roadways to which it connects.

### Character of the Area (§ 4.16.2.g) (Appellants' Questions 1(c) and 3–19)

The criterion for conditional use approval that is the focus of the majority of questions in Appellants' Statement of Questions is whether the proposed project will result in an undue adverse effect on "[t]he character of the area affected as defined by the purposes of the zoning district and the stated policies and standards of the Plymouth Town Plan." § 4.16.2.g. This criterion derives from the state enabling act, which requires municipalities to include in their regulations for conditional use approval that a project not result in an undue adverse effect on, among other things,

9

"[t]he character of the area affected, as defined by the purpose or purposes of the zoning district within which the project is located, and [by] specifically stated policies and standards of the municipal plan." 24 V.S.A. § 4414(3)(A)(ii).[6]

In Question 1(c) Appellants ask the general question of whether the proposed project will result in an undue adverse effect on the character of the area as defined in § 4.16.2.g. In Questions 3 through 19 Appellants ask more specifically whether the project will result in an undue adverse effect on the character of the area as defined by the purpose statement in § 2.2 of the Zoning Ordinance regarding the three Rural Densities zoning districts (districts zoned respectively for a density of two acres, five acres, or ten acres per dwelling unit) in connection with various specific statements in the Town Plan.

As to the three Rural Densities zoning districts generally,[7] § 2.2 states in full that the purpose of those three districts is:

> [t]o relate and guide density of rural settlement to the physical limitations imposed by the land, thus minimizing potential health problems and costs to taxpayers for the provision of public services and utilities; and to create a pattern of settlement which is compatible with the rural and natural character of the town.

Appellants' Questions 3, 4, 5, 7, 8, 11, 12, 14, 15, 16, 17, 18 and 19 relate various statements in the Town Plan to the purpose statement in § 2.2 that all three Rural

---

[6] The 2004 amendments to Chapter 117 recodified the minimum required conditional use standards in §4414(3)(A), and further defined the "character of the area affected" as being "defined by the purpose or purposes of the zoning district within which the project is located, and [the] specifically stated policies and standards of the municipal plan." The added definitional language makes clear that the character of an area refers to its character as it is intended to be, if the specifically stated policies and standards of the municipal plan are carried out.

[7] With regard to the purpose statement, Section 2.2 does not distinguish among the two-acre, five-acre, and ten-acre Rural Densities zoning districts, even though the introductory language of the section states that the "specific purpose of each Zoning District shall be as follows."

10

Densities zoning districts are intended to "create a pattern of settlement which is compatible with the rural and natural character of the town." Appellants' Questions 6, 9, 10, and 13 relate various statements in the Town Plan to the purpose statement in § 2.2 that all three Rural Densities zoning districts are intended to "relate and guide density of rural settlement to the physical limitations imposed by the land."

As to each of Appellants' Questions, Applicant argues that no legally enforceable standards, policies, or provisions of the 2005 Plymouth Town Plan or the 2007 Plymouth Zoning Ordinance prohibit Applicant's proposed subdivision, and that, in any event, the provisions referenced in Appellants' Statement of Questions are not sufficiently specific to be enforceable.

Unlike the regulatory provisions struck down in In re Appeal of JAM Golf, LLC, 2008 VT 110, ¶¶ 14, 16–17, 185 Vt. 201, the reference to the Town Plan in § 4.16.2.g does not purport to require that a conditional use must conform with the municipal plan. That is, the reference does not have a regulatory effect, and therefore resolving the argument over whether statements in the Town Plan would be sufficiently specific to be independently enforceable is unnecessary.[8]

Rather, § 4.16.2.g and 24 V.S.A. § 4414(3)(A)(ii) simply refer the Planning Commission, and hence this Court, to the purpose statement of the zoning district,

[8] A regulatory provision must be specific enough to allow the decisionmaker both "clearly to identify the resources or features to be protected" and "to discern the degree or level of protection that must be achieved for each identified resource or feature." In re Highlands Development Co., LLC & J.A.M. Golf, LLC Master Plan Application, No. 194-10-03 Vtec, slip op. at 15 (Vt. Envtl. Ct., Feb. 2, 2010) (Wright, J). Applicant and the Town both argue that the provisions of the Town Plan are too vague to provide a legally enforceable standard by which the proposed subdivision could be judged; however, because those provisions are not made directly applicable to the proposed project by any provision of the zoning ordinance, it is not necessary to reach the constitutional question. See State v. Patnaude, 140 Vt. 361, 368 (1981) (constitutional issues "will not be considered by [the] Court unless disposition of the case requires it.").

11

as well as to any "specifically[9] stated policies and standards" for the area of the project in the Town Plan, in order to define what is the character of the area potentially affected by the project. The reference to the Town Plan is solely as the source of specific information, if any, to determine the character of the affected area. The character of the affected area must be determined before it is possible to determine whether a proposed project will result in an undue adverse effect on that character.

Because the Zoning Ordinance does not distinguish among the three categories of Rural Densities zoning districts—two-acre, five-acre, and ten-acre—the Zoning Ordinance's general purpose statement in § 2.2 about the Rural Densities districts is of only limited utility in defining the character of the area potentially affected by the project, because it refers to the "rural and natural character of the town" as a whole rather than to the character of a more limited and specific area. By contrast, § 2.11 defining the Coolidge Homestead Historic Area does specifically describe the extent and the nature of the Plymouth Notch village and the Coolidge Homestead area, and specifically states the purpose and goal of that district. Similarly, § 3.13.1 establishes specific requirements for the protection of the scenic or natural beauty of a ridge or hillside with regard to applications for wireless communication towers, and § 2.9(C) limits the cutting of shoreline vegetation to protect the view of the shoreline when viewed from the lakes and ponds making up the Shoreland Overlay zoning district. § 2.4. There are no equivalent provisions in the Zoning Ordinance protecting or regulating the hillsides of the project area when viewed from Echo Lake or from a public road within the town.

Nor does the Town Plan provide any specific description of the area

---

[9] Although § 4.16.2.g does not use the word "specifically," the statutory section is mandatory and therefore the specificity requirement is applicable. In re White, 155 Vt. 612, 618–20 (1990).

potentially affected by the project, or of the character of that area, unlike the Town Plan's specific identification of named scenic areas on pages 30–31, or its specific identification of historic landmarks and sites on pages 33–34. The Town Plan describes rural and natural characteristics of the town as a whole, stating that the Town's "landscape is defined by the contrast between steep wooded mountains and narrow open valleys." Town Plan at 10. The Town Plan identifies several scenic features, including Amherst Lake and Echo Lake which are "recognized for their beauty," and Colby Pond and Kingdom Road, which "seem like they are at the top of the world." Id. at 31. The Town Plan describes Chapman Road as a "rural road . . . bordered by large maples and old farmsteads." Id. At best, it provides municipal policies applicable to the upland areas of the town as a whole.[10]

Therefore, this decision proceeds to analyze the questions in Appellants' Statement of Questions in two groups: those that relate various statements in the Town Plan to the purpose statement in § 2.2 that the Rural Densities zoning districts are intended to "create a pattern of settlement which is compatible with the rural and natural character of the town," and those that relate various statements in the Town Plan to the purpose statement in § 2.2 that the Rural Densities zoning districts are intended to "relate and guide density of rural settlement to the physical limitations imposed by the land."

> Character of the Area: Pattern of Settlement Compatible with Rural & Natural Character of Town (Appellants' Questions 3, 4, 5, 7, 8, 11, 12, 14, 15, 16, 17, 18 and 19)

One of the general purposes of the three Rural Densities zoning districts is to

---

[10] As nothing in the Town Plan or the Zoning Ordinance adopts by reference any policies of the regional plan, the regional plan cannot be used to assist in defining the character of the area.

"create a pattern of settlement which is compatible with the rural and natural character of the town."

The rural and natural character of the town as a whole, and its contrast between steep wooded mountains and narrow open valleys, including the view of the project's hillside from across Echo Lake, is preserved by the Town Plan's policy that roads leading into remote areas not planned for development not be improved, so as to encourage development only in the areas where the Town believes it is appropriate. Town Plan at 16. The Rural Densities Five-Acre zoning district is by its terms an area planned for development at a five-acres-per-dwelling-unit density. The proposed project does not involve the improvement of a town road in a remote area not planned for development. Rather, the project is served by an access road that connects to an existing town road in an existing subdivision.

In the Rural Densities Five-Acre zoning district, maintenance of this density allows for continued appreciation, generally, of "the beauty of clustered village houses, isolated farms, and scenic mountain vistas" by both the residents of and visitors to the Town. Id. at 8. The condition limiting the vista cut areas to only 1.5 acres of the project, and to only where proposed on Lots 1, 4, and 5, will minimize any effect on the view of the project property's hillside from Route 100 and Echo Lake, consistent with the character of the area as a wooded hillside.[11]

Although the lots in the Dix Hill Subdivision average just over ten acres in area, because they are long narrow lots, houses on those lots placed conveniently to the road are of necessity located closer to one another than the size of the lots would

---

[11]   Appellants and Interested Persons expressed concern about the enforcement of these limitations. The enforcement of any limitations that are part of the approved plans or are made conditions of a permit, whether by the municipality or by interested persons under 24 V.S.A. § 4470(b), or by the municipality under 24 V.S.A. § 4451, is beyond the scope of this decision.

14

suggest. The five lots in Applicant's project are compatible with the character of the area as defined by the five-acre density established by the zoning district, as well as with the appearance of the houses and lots in the neighboring Dix Hill Subdivision.

Character of the Area: Density Related to Physical Limitations<br>of Land (Appellants' Questions 6, 9, 10, and 13)

The other general purpose of the three Rural Densities zoning districts is to "relate and guide [the] density of rural settlement to the physical limitations imposed by the land, thus minimizing potential health problems and costs to taxpayers for the provision of public services and utilities."

The physical limitations which the Planning Commission must consider when evaluating the character of the area are clarified by the Town Plan, which focuses primarily on the "capacity of soils to accommodate safe septic systems." Town Plan at 9. At the time of the 2005 Town Plan, the state had not yet fully assumed responsibility for regulating on-site wastewater disposal systems, and the Town of Plymouth then had its own septic system regulations.[12] Id. The Town Plan explains that the suitability of any lot for an on-site septic system should be evaluated on a site-by-site basis, based on "factors such as soil type, steepness of slope, depth to bedrock or other impervious material, high ground water table, and flooding hazard." Id. Nevertheless, it notes that three different rural densities: two acres per dwelling unit, five acres per dwelling unit, and ten acres per dwelling unit, were identified based on the suitability of the soils, and states that the zoning

---

[12] In 2002, the state assumed responsibility for regulating potable water supplies and wastewater systems, and established a five-year phase-out period for municipal regulation of such systems. 2001, No. 133 (Adj. Sess.); codified as 10 V.S.A., Chapter 64. The statute provided that municipal ordinances (including zoning bylaws) regulating potable water supplies and wastewater systems would be superseded by the state statute and rules as of July 1, 2007. 10 V.S.A. § 1976(b).

ordinance establishing the three Rural Densities districts "is compatible with" the rural densities as described in the Town Plan. Id. The Town Plan states that the five-acre medium density "should be maintained where suitability ranges from fair to poor" and that areas zoned for this density "have 10% to 15% slopes and soils with moderate limitations." Id.

Thus, as discussed in the Town Plan, by virtue of being located within the Rural Densities Five-Acre zoning district, the project property is presumptively suitable for residential development at a density of five acres per dwelling unit, subject to an evaluation of the project property's suitability for septic disposal. In fact, a previous proposal for this property that featured separate on-site wastewater disposal systems was rejected by the Planning Commission. The present proposal for a community mound-type disposal system, with individual septic tanks and pretreatment filtration, has received state approval. Therefore, the density of the proposed subdivision will not result in an undue adverse effect on the character of the area as defined by the density of the zoning district and the physical limitations of the project parcel.

Similarly, the fact that the project's access road connects to an existing town road, and does not represent any increased cost to the taxpayer for the provision of public services, means that the proposed project will not result in an undue adverse effect on the character of the area as defined by that aspect of the purpose statement of the zoning district.

Adequacy of Landscaping, Screening and Setbacks (§ 4.16.2.c)
(Appellants' Question 1(b))

Lastly, Appellants ask whether the design of the proposed subdivision will result in an undue adverse effect on the adequacy of landscaping, screening, and setbacks to achieve maximum compatibility with, and protection of, other properties

16

in the area.

Given the heavily wooded nature of the project property and the distance from the proposed house sites to any neighboring property, the natural screening and setbacks of the 93-acre project property achieves the maximum compatibility with and protection of other properties in the area.

However, no landscaping or screening has been proposed for the project's access roadway as it passes adjacent to the McGee driveway within view from the McGee house—that is, between the end of Dix Hill Road and the beginning of the tree line on the McGee property (at approximately elevation 1748). Although Appellants do not specifically request any findings or conditions related to the screening of this access roadway, in order to meet the standards of "maximum compatibility" and "protection" in § 4.16.2.c, Applicant must install screening or landscaping in the stretch of access roadway from the end of Dix Hill Road to the beginning of the tree line on the McGee property (at approximately elevation 1748), between the access roadway and the McGee property line, so as to shield the McGee house as much as possible from the lights and noise of cars passing along the access roadway. With the addition of whatever landscaping or other screening is possible in that location to accomplish that result, given the limited available space within the fifty-foot-wide strip, the proposed project meets the requirements of § 4.16.2.c.

Accordingly, based on the foregoing, it is hereby ORDERED and ADJUDGED that, conditional use approval is hereby GRANTED to Applicant's subdivision, subject to the following conditions. As discussed above, Conditions 1 through 5 are derived from those imposed by the Planning Commission and restated by the Court;

Conditions 6 through 8 are the three additional conditions required by this decision.

1. Clearing limits are limited to those shown on Ex. H5, so that areas allowed for vista clearing shall not exceed a total of 1.5 acres for the project as a whole, with no clearing to occur on slopes greater than 25%.

2. Applicant and its successor lot owners shall comply with the requirements of § 3.15 of the Zoning Ordinance as to outdoor lighting, including as to downward-directed lighting and shielding.

3. The subdivision shall not have access to or from Kingdom Road, that is, the so-called Gilmore Road shall not be used for access to Kingdom Road.

4. Applicant shall obtain a driveway access permit for the project access road onto Dix Hill Road.

5. The portion of Lot 5 that lies east of Gilmore Road, consisting of approximately 18 acres, may be developed with not more than one single-family dwelling, and shall not be further subdivided.

6. Prior to commencing site work, Applicant shall obtain amended coverage under the Construction General Permit 3-9020 reflecting the seven-day-stabilization condition.

7. The turn into the Lot 3 driveway from the cul-de-sac serving Lots 1, 2, and 3 shall be designed so that, with such maneuvers as are necessary within the cul-de-sac, a pumper fire truck will be able to negotiate the turn into the Lot 3 driveway. Applicant shall also verify that a pumper fire truck located in the cul-de-sac will be able to pump water to the location and elevation of the Lot 3 house site.

8. Applicant shall install screening or landscaping in the stretch of access roadway from the end of Dix Hill Road to the beginning of the tree line on the McGee property (at approximately elevation 1748), between the access roadway and the McGee property line, so as to shield the McGee house as much as possible from the lights and noise of cars passing along the access roadway, given the limited

18

available space within the fifty-foot-wide strip.

Done at Berlin, Vermont, this 9th day of February, 2012.

_____
Merideth Wright
Environmental Judge